Albertha BRODEUR

v.

Joseph DESROSIERS.

No. 83–216–Appeal.

Supreme Court of Rhode Island.

Feb. 25, 1986.

Edward J. Mulligan, Pawtucket, Joseph M. DiGianfilippo, Sutherland & DiGianfilippo Inc., Woonsocket, for plaintiff.

Paul A. Anderson, Anderson Anderson & Zangari, Providence, for defendant.

**OPINION**

KELLEHER, Justice.

For many Rhode Islanders, the summer season is a great time for family reunions. Thus it was that on July 2, 1978, the plaintiff, Albertha Brodeur (Albertha); her son, Larry; his wife, Meredith; and their children left Albertha's Slatersville home for a "family picnic." The defendant, Joseph Desrosiers (Joseph), was at the picnic. Joseph had been married to Albertha's niece, and the couple resided in Woonsocket. After the death of his wife, Joseph remarried and moved to Warwick, where he and his second wife still reside in a one-family home. Prior to the time of the picnic, Joseph had seen Albertha and the other members of the Brodeur clan but once in the twenty-five years following his first wife's death. The reunion took place earlier in the summer at the home of Joseph's daughter. At that time it was decided that the Brodeurs would join the Desrosiers family at a picnic to be held in Goddard Park.

After the picnic had ended somewhere between 6 and 7 p.m., Albertha and her family went to Joseph's home for what turned out to be a post-prandial chat. As all good things must come to an end, so too did the Brodeur-Desrosiers reunion. At approximately 9 p.m. Albertha and her traveling companions started to leave Joseph's home by way of the kitchen and side door. To leave the kitchen, it was necessary first to step out onto a landing that was approximately three feet square and then turn left and go out the rear door, which led to a driveway. To the right of the landing was an open doorway that led to a flight of cellar stairs. The door to the cellar, which opened inward, was always kept open. A latch on the back bottom edge of the door attached it to the cellar wall. This attachment ensured that the door's position was fixed.

Albertha's son, Larry, preceded her out of the kitchen onto the landing and began to open the storm door to go outside. Albertha, who was directly behind him, testi-

fied that she had her right hand on the door jamb to balance herself as she stepped out of the kitchen onto the landing. Letting go of the door frame, she stepped down with her right foot and found the step higher than she had expected. Her left foot "went up" and she lost her balance, falling backward down the cellar steps "into a box." She stated that there was nothing slippery on the step, nor did she catch her heel on anything as she stepped down.

Albertha, who at the time of trial was in her midseventies, testified that she was partially blind because of "sugar," that her deficiency began when she was forty-five years old, and that it had been the same since then. She had been declared "legally blind" by the Rhode Island Division of Services for the Blind in 1964. Albertha further testified that she could see light but not color and that to see more clearly, she had to look out of the corners of her eyes. As she stepped onto the landing at the time of the fall, she saw light to her left, in the direction of the outside door, but not to her right where the cellar stairs were. Had there been a light to her right, she testified, she certainly would have seen it, her attention would have been drawn to the cellar stairs, and the mishap would not have occurred.

Albertha stated that she could not recall if she said anything to Joseph about her blindness at their meeting at Jean's house and that the matter wasn't "brought up" when she spent time with Joseph and his wife the day of the picnic.

Joseph's account of the events leading to the fall differed somewhat from Albertha's, but the differences are immaterial to a resolution of this controversy. He did testify that the light at the foot of the cellar stairs was on at the time of the accident. He also asserted that in the forty years that he had known Albertha, he never knew anything about her trouble with her eyes. He first found out that Albertha was partially blind three weeks after the fall. His meeting with her earlier at his daughter's house and at his own house the day of the picnic—the first after a twenty-five-year lapse—gave him no inkling of her problem. Joseph's wife also testified that Albertha's behavior on both occasions gave no indication that she was visually impaired.

The Desrosiers both insisted that in the fourteen-year period from the time they purchased the house until the time of Albertha's mishap, all persons who had occasion to use the back-door entry did so without any incident.

Albertha's amended complaint, filed in Superior Court, charged Joseph with negligence in permitting "the cellar door or door and stairway and landing leading to the rear entrance and cellar to be and remain in a dangerous and defective condition," which negligence proximately caused Albertha's injury. Specific allegations included Joseph's failure to maintain the stairway adequate in lighting, design, and construction; failure to provide adequate lights at or near the door leading to the cellar; leaving the cellar door ajar, unlocked, and unguarded; and failure to warn Albertha of the danger or otherwise protect her from that danger.

In returning its verdict, the jury made a special finding that Albertha's injuries were not caused by any negligence on Joseph's part. In her appeal Albertha faults the trial justice's charge and his denial of her motion for a new trial.

Albertha contends that the trial justice improperly denied certain of her requests for instructions, first, regarding the applicability of § 402.2 of the Building Official and Code Administration's (BOCA) basic building code, adopted as the State Building Code under G.L.1956 (1979 Reenactment) § 23–27.3–1, and second, regarding her impaired vision.

Section 402.2 of the BOCA code provides in pertinent part as follows:

"§ 402.2 *Swing and Force to Open.*

 a. Doors in means of egress * * * shall swing in the direction of exit travel.

 * * * * * *

 d. Doors to stairways shall not open immediately onto a flight of stairs; they shall open onto a landing, the length and width of which are not less than the width of the door."

At the close of the evidence, the trial justice took judicial notice of these provisions of the BOCA code but refused to give the following requested instruction to the jury:

 "19. If you find that the cellar door in opening down to the cellar stairs, rather than away from the stairs existed on the date of the accident, then such a condition is a violation of the City Ordinance of the City of Warwick and the Statute of Rhode Island and you may find the Defendant guilty of negligence for breach of the ordinance and/or statute."[1]

He also refused the following supplemental requested instructions:

 "You are hereby instructed that state law requires that all buildings and structures and all parts thereof shall be maintained in a safe condition, and that all means of egress, which includes cellar doors as well as outside doors, shall be maintained in good working order; and that failure or neglect to comply with the state law is negligence. G.L. 23–27.3–104.0 (enacted 1976, ch. 256, § 1). [Supplemental Requested Instruction # 1.]

 "You are instructed that the Warwick Building Code, which applies to all buildings requires that 'Doors to stairways, shall not open immediately onto a flight of stairs; they shall open onto a landing, the length and width of which are not

less than the width of the door.['] BOCA 402.2(d). * * * [Y]ou may consider such as to whether or not the defendant was negligent in not complying with the Warwick Building Code and whether or not such compliance was a direct or proximate cause of the plaintiff's injuries. [Supplemental Requested Instruction # 2.]"

In denying Albertha's request, the trial justice found that according to chapter 27.3 of title 23, which adopted the BOCA code as the State Building Code, its provisions were meant to apply only to buildings built or substantially altered after its enactment.[2] Finding that Joseph had bought his home long before the adoption by the state of the BOCA code and that he had made no alterations to it since then, the judge declared that there had been no violation of the statute and as such he could not charge that its violation was evidence of negligence.[3]

Albertha agrees that Joseph is exempt from any criminal violation of the statute but argues that the statute and ordinance set forth a standard of conduct applicable to all landowners with regard to cellar doors and that the violation of such a standard is admissible as evidence of negligence.

 We first note that according to Rule 51(b) of the Superior Court Rules of Civil Procedure, "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." *See Cannone v. New England Telephone and Telegraph Co.*, 471 A.2d 211, 214–15

---

1. The City of Warwick adopted the BOCA code as the Building Code of the City of Warwick effective July 18, 1972. Warwick Code of Ordinances § 4–1(a) and (d) (1984). Albertha makes clear in her brief to this court that the Warwick city Ordinance to which she refers in requested instruction 19 is the ordinance adopting the BOCA code.

2. Several provisions in the State Building Code support this finding. *See* G.L.1956 (1985 Reenactment) §§ 23–27.3–105.1, 23–27.3–106.0, 23–27.3–120.3, and 23–27.3–124.1(11).

3. Although the trial justice referred only to the state statute in his ruling, we note that the Warwick Building Code was also not in effect at the time Joseph's home was built. *See supra* note 1.

(R.I.1984). The purpose of this rule is "to afford the trial justice an opportunity to make any necessary corrections in his instructions." *A.R. Alvernas, Inc. v. Cohen,* 420 A.2d 78, 81 (R.I.1980). Thus, general objections to instructions, without any specific statements as to the grounds therefor, provide this court with nothing to review. *Johnson v. Palange,* 122 R.I. 361, 373, 406 A.2d 360, 366 (1979).

Although Albertha objected to the trial justice's refusal to instruct as she had requested, she specified no grounds for her objections. Her argument that the code, although not violated by Joseph, is relevant in determining the standard of care by which his behavior should be measured was not raised at any time before the lower court. Indeed, only her second supplementary requested instruction even suggests that the jury use the statute in the manner she suggests, and it is far from specific.

█ Admittedly, this court will not use rigid adherence to Rule 51(b) as a vehicle for overlooking trial errors. *A.R. Alvernas, Inc. v. Cohen,* 420 A.2d at 81–82. However, we find no such error here. It is well established in Rhode Island that if a violation of a statute or ordinance is the proximate cause of injury, evidence of the violation is "prima facie evidence" of negligence. *Sitko v. Jastrzebski,* 68 R.I. 207, 210, 27 A.2d 178, 179 (1942). Where, however, as a matter of law a defendant cannot be held to the standard articulated in the statute, as for example, if he is a minor, the trial justice need not draw the attention of the jury to the statute. *Fontaine v. Devonis,* 114 R.I. 541, 547, 336 A.2d 847, 852 (1975). Here, since neither the statute nor the ordinance is applicable to the condition that existed at the time Joseph purchased his house in the mid–1960s, the trial justice was not required to charge as requested by Albertha. To admit such a statute, or to instruct regarding its use, not only would unjustly prejudice the defend-

ant, but would also fly in the face of the specifically stated intent of the Legislature that the statute be nonretroactive. Recently, this court in *Pankiw v. Polish National Catholic Church of our Savior,* 493 A.2d 819, 821 (R.I.1985), sustained a trial judge's ruling that an expert could not give his opinion about whether a stairway in a church built in 1965 had been defectively designed based upon the BOCA code when the witness conceded that he was unaware of the provisions of the BOCA code in 1965.

Albertha also claims error in the trial justice's refusal to instruct as to her blindness, in particular to his omission of requested instruction No. 11. Instruction No. 11 reads as follows:

"11. As to whether or not the Defendant knew or ought to have known that the Plaintiff had a vision or eyesight problem on the date of the accident, is for you to decide on your own common experience, taking into consideration the relationship of the parties and their families, the length of the time they knew each other, the amount of family contact, the length of time the Defendant spent with the Plaintiff, and the like."[4]

█ It is well settled that the charge given to the jury must be applicable to the facts that have been adduced in evidence and that a request for instructions is properly denied when there is no basis for such instruction in the evidence. *Labrecque v. Branton Yachts Corp.,* 457 A.2d 617, 619 (R.I.1983). An erroneous charge warrants reversal only if it can be shown that the jury " 'could have been misled' to the resultant prejudice of the complaining party." *Anter v. Ambeault,* 104 R.I. 496, 501, 245 A.2d 137, 139 (1968).

Although the trial justice did not state his grounds for refusing this instruction, in considering Albertha's motion for a new trial, he indicated that he did not think there was sufficient evidence that Joseph was aware of Albertha's impaired vision to

---

4. Although we again note Albertha's failure to comply with Super.R.Civ.P. 51(b), we feel that the basis for the objection was sufficiently obvi-

ous in this instance to apprise the trial justice of possible error and to afford him the opportunity to correct it.

warrant attention. Albertha contends that the record was replete with references to her eyesight, that it was for the jury to decide whether Joseph was aware of her condition, and that the trial justice should have instructed accordingly.

■ We need not address these arguments since we find that error, if any, in this instance, does not merit reversal. Although we acknowledge that if Joseph knew of Albertha's incapacity, he owed her a duty of care that took her incapacity into consideration, *see Berger v. Shapiro*, 30 N.J. 89, 99–100, 152 A.2d 20, 25–26 (1959), his failure to act in accordance with that duty amounted to negligence only if it proximately, rather than remotely, caused Albertha's injury. *Mullaney v. Goldman*, 121 R.I. 358, 363, 398 A.2d 1133, 1136 (1979). To establish such causation in this instance, Albertha had to show that but for Joseph's negligence in regard to her blindness, the harm that befell her would not have occurred. *Id.*

There is not one shred of evidence in this record to support a reasonable inference that Albertha's blindness contributed in any way to her fall. Albertha's own testimony about her fall indicates only that she "lost her balance" when she stepped down onto the landing, finding the step to be higher than she had anticipated. Although it might be conjectured that Albertha's perception of the height of the step was altered because of her impaired vision, there is no testimony to that effect, and a plaintiff in a negligence case "may not rely on conjecture or speculation to establish the essential elements of his case * * *." *Salk v. Alpine Ski Shop, Inc.*, 115 R.I. 309, 313, 342 A.2d 622, 625 (1975). Except for this "possibility," there is no indication in the record that Albertha's awareness of the physical surroundings on the landing differed in any respect from that of any of the other sighted persons who used the side exit before her. Neither Albertha's son, Larry, nor her daughter-in-law, Meredith, noticed the cellar door as he or she left the house or was aware of any light over the landing.

Given the lack of evidence that Albertha's blindness caused her fall, the jury was not misled by the trial justice's refusal to charge as to Joseph's awareness of that blindness in concluding that Joseph was guilty of no negligence that proximately caused Albertha's injuries. We therefore hold that even if the trial justice erred in his refusal to so instruct, such error would not merit reversal.

■ Albertha lastly contends that the trial justice erred in denying her motion for a new trial. In ruling on such a motion, a trial justice exercises his independent judgment and reviews the evidence in light of his charge to the jury, passing on the weight of the evidence and the credibility of the witness. If he concludes that the evidence is so evenly balanced that reasonable minds could differ, he must approve the verdict even though he may have doubts about its correctness. *Zawatsky v. Cohen*, 463 A.2d 210, 212 (R.I. 1983). If the trial justice properly performs such duties, this court will not disturb his decision unless the moving party shows that he overlooked or misconceived material evidence or was otherwise wrong. *Pray v. Narragansett Improvement Co.*, 434 A.2d 923, 932 (R.I.1981).

The trial justice in this instance clearly fulfilled his responsibility. He carefully reviewed the evidence, describing the events of the afternoon and the circumstances on the landing. He specifically noted that there had been no falls on the landing in the many years that Joseph had lived in the house; that it was not established clearly whether there was insufficient light in the house but that in any event lighting was not an important part of the case; that the evidence indicated that Albertha lost her balance when she stepped down onto the landing, which led to her fall down the stairs; and that there was no evidence that the step was improperly constructed. As we mentioned earlier, he found evidence of Albertha's blindness not

critical to his consideration of the motion since it had not been convincingly shown that Joseph was aware of it.[5]

Relying upon this review of the evidence, the trial justice concluded that even though he personally would have found Joseph negligent had he been on the jury, reasonable minds could differ on the question of whether he was negligent; accordingly, he denied Albertha's motion for a new trial. We find the trial justice's action to be completely in accord with our established standard and further that he neither overlooked nor misconceived material evidence, nor was he clearly wrong.

Albertha's appeal is denied and dismissed, and the judgment and order appealed from is affirmed.

---

5. During the hearing on the motion, although not in his final decision, the trial justice remarked that there was no evidence that Albertha's vision caused her tripping and that "if she tripped, according to the testimony, good vision or bad vision, she would have fallen down the stairs."