Patricia SOARES

v.

ANN & HOPE of RHODE ISLAND, INC.

No. 93–142–Appeal.

Supreme Court of Rhode Island.

Feb. 7, 1994.

Brian VanCouyghen, VanCouyghen & Lally, Wakefield, for plaintiff.

Charles Redihan, Jr., Kiernan, Plunkett & Redihan, Providence, for defendant.

## OPINION

MURRAY, Justice.

This matter came before the Supreme Court on the appeal of the defendant, Ann & Hope of Rhode Island, Inc. (Ann & Hope), from a Superior Court judgment on a jury verdict in favor of the plaintiff, Patricia Soares (Soares). Soares cross-appeals a myriad of rulings made before and during trial.

This civil action for damages arose out of an alleged shoplifting incident at Ann & Hope's store in Seekonk, Massachusetts. At trial the parties presented significantly divergent versions of the event and its aftermath. It is therefore necessary to review the record in depth.

Soares testified that on April 26, 1988, she dropped off her husband, Joseph Soares (Joseph), after work and then picked up her son, Joey, at day care. Joey needed a pair of sneakers, so she took him to Ann & Hope.

Once they entered the store, Soares testified, she placed Joey in a carriage and proceeded directly to the shoe department. She tried a few sizes and styles on Joey, and he selected a pair that he liked, which she tried on him. She attempted to find the price, but there was no price on the sneakers, only a tag. Then she checked the box from which she had removed the sneakers, and she found the "gum sticker" inside the box. She explained that the gum sticker is an adhesive tag that contains a price.

Soares removed the sticker from the box and placed it on the tag from which she thought it had come. She figured that in replacing a price tag that had fallen off, she was doing nothing wrong. It had been her experience as a shopper and a former cashier that "prices do fall off things." She and Joey subsequently left the shoe department, she selected a can of hairspray, and she paid for their purchases.

As Soares and Joey started to exit from the store, an Ann & Hope security guard stopped them. When he asked her to follow him, she asked why. He told her that they would talk about it once they arrived "upstairs." She inquired why again, and he replied that they could not talk about it then but that he would talk to her upstairs. She further testified that she felt that she had no choice regarding whether or not to go upstairs.

Once upstairs, they entered an office, where Soares and Joey sat down, and Soares again asked what the problem was. The security guard informed her that he had seen her take a price tag from one pair of shoes and attach it to another pair. She denied having done this and explained that she had found the price tag in the box from which she had obtained the shoes. She further explained that she put the price on the tag because she thought it had fallen off from that tag. The guard repeated his version, and Soares reiterated her denial and restated that she had found the price tag in the box. She also offered to pay the correct price if the tag in the box indicated an incorrect price. The security guard stated that he was sorry but that it was too late—the police had been called and the paperwork had been done.

Soares testified that she felt "totally in shock." She did not feel that she was free to leave the room, and she could not believe that this was happening, especially when her son was present. She felt that the guard was not trying to verify her account or the correct shoe price.

When a police officer arrived, the guard told him something out of Soares's earshot. The police officer then told Soares that she was being arrested for shoplifting and put handcuffs on her. She asked him why he had to put handcuffs on her in front of her

son, and he replied that he had to place them on her anyway and that she should have thought about that before she changed the prices. Soares testified that being handcuffed in front of Joey was heartbreaking and one of the worst experiences of her life. She did not have an opportunity to speak with the manager or anyone but the security guard. She and Joey were led downstairs through the front of the store and outside into the police car. Joey asked the officer whether his "mommy" was going to jail. She tried to reassure him, but she actually felt very nervous and upset.

At the police station, Soares testified, the police fingerprinted and photographed her. She stated that her belongings were searched, and the police placed her in a cell with a mat and a toilet. She was released after about an hour, when bail was posted. She could not eat or sleep that night, and she cried for approximately an hour after going to bed.

The following day Soares was arraigned in District Court in Taunton, Massachusetts. The trial took place approximately four months after her arraignment. She was found not guilty, and the case was dismissed.

She testified that the weeks preceding her trial were "very emotional." She was very much afraid of being found guilty. She feared losing her job, her family, and her friends. She stated that before the Ann & Hope incident, she had had a happy marriage, a good job, and good friends; she was also very confident. After the incident, however, she no longer wanted to be around people or to go out or to church or to answer the telephone. She always wanted someone with her when she went shopping. She did not share her feelings with her husband as she used to, and she wanted to be left alone. She sometimes experienced an upset stomach or vomited when she thought about the upcoming trial. She testified that she did not seek medical attention because she felt that perhaps she could handle the situation and she did not want people to think that she was "nuts" or "crazy."

Soares further testified that in 1978 and 1979 she worked as a cashier in the Ann & Hope store located in Warwick. She was familiar with the store's security procedures, specifically, the observation towers in the middle of the store, mirrors along the wall, cameras throughout the store, and plainclothes people walking about. She also stated that, as a cashier, she had to match the price tags to the codes written inside the merchandise being purchased. The price, size, and style numbers were supposed to match.

Ann & Hope's account of the events that took place on April 26, 1988, differed significantly from Soares's. The security guard, Gregory Daniels (Daniels), testified that when he first noticed Soares, he was in the observation tower in the shoe department, located about three or four feet above the floor. The mirrors on the tower's exterior enable store detectives to look out and no one to look in.

Daniels observed Soares looking at a pair of shoes, with both hands on a ticket. She turned her back toward him for a second, still holding the ticket. He stated that it looked like her hands were moving, but he could not determine what she was doing. When she turned around, he saw that she had a "sticky price ticket," which affixes to the bottom of the tag, on her right index finger. Using a pair of binoculars, he then focused on her. She walked toward where he was located, removed a box of Captain Power sneakers from the shelf, and proceeded to a bench that was approximately five to ten feet in front of him. She tried one of the sneakers on her son, took it off, and returned the first box of sneakers to the shelf. She then obtained a second box of sneakers and tried them on her son, all the while keeping the sticky tag on her index finger. He stated that he saw her put the sneakers back into the box, remove the tag stuck to her index finger, and place it over the cardboard price tag. She then took her son off the bench and walked toward the front of the store.

Daniels immediately exited the observation booth, went to the aisle where Soares had been, and looked at about two or three pairs of sneakers to ascertain the price, which he stated was $14.99. He did not find out where the price tag in question had come

from or whether a price tag was missing from a pair of sneakers. He also did not see where she had obtained the price tag, as her back was turned to him at that point.

Daniels testified that while he kept Soares under surveillance when she was in the checkout line, he telephoned the manager in the shoe department and asked her to check the price of the sneakers. He also requested that she meet him in the security office with a pair of the sneakers and an inventory price list. Meanwhile, he continued watching Soares and observed that the price that she paid for the sneakers was $11.24.

Daniels stopped Soares as she was exiting the store. He identified himself as store security and informed her that there was "a small problem with [her] last purchase." Initially she did not want to follow him, and she seemed upset and angry. His supervisor then joined them and told Soares that if she would just follow them they could "straighten this out."

Once upstairs, Daniels explained to Soares what he had seen. She stated that she had in fact put a price tag onto the sneakers but that she had found it in the box and thought that it stated the correct price. Daniels also testified that Soares offered to pay the difference if the price tag did not reflect the correct price. He said that the shoe department manager brought a pair of the sneakers in question and the correct price was $14.99. He also checked the inventory list of prices.

Daniels filled out the paperwork for a statement to the police and asked Soares some questions. He estimated that this took him approximately twenty-five to thirty minutes. His supervisor spoke with Soares for about a minute, left to speak with the manager, then returned and instructed Daniels to call the Seekonk police. He testified that Soares was taken into the security office at approximately 6:45 p.m., the police were called about fifteen minutes later, and they arrived at approximately 7:15 p.m. Soares was then escorted out of the store.

Daniels was subpoenaed to testify at Soares's trial in Massachusetts. At that proceeding, he testified that he checked the price of two or three pairs of shoes on the shelf and called the shoe department to verify the price. He also stated that he checked the inventory sheet and a third pair of sneakers for the correct price. With regard to the criminal trial, he testified that "without a written document stating the correct price on that date, they said my observations were hearsay evidence for the price." The criminal case was basically dismissed, he stated.

Soares filed a complaint against Ann & Hope, alleging that Ann & Hope had deprived her of her right to privacy, falsely imprisoned her, and maliciously prosecuted her in connection with the alleged shoplifting incident. Before trial, Soares moved to amend her complaint. The motion justice granted the motion with regard to adding a claim against Ann & Hope for negligent training and/or supervision of an employee and a claim for punitive damages. She refused, however, to allow Soares to join her husband, Joseph, as a plaintiff or to add his claim for loss of consortium.

After presenting her witnesses at trial, Soares sought to have Ann & Hope's financial statements admitted into evidence. Ann & Hope objected, claiming that they would be relevant only to the issue of punitive damages. It further argued that the trial justice should not instruct the jury regarding punitive damages because the evidence presented did not warrant such a charge. The trial justice did not allow the financial statements into evidence and decided not to instruct the jury on punitive damages.

After Soares had rested her case, the trial justice granted Ann & Hope's motion for a directed verdict with respect to the claims for negligent supervision and violation of the right to privacy. He denied the motion for a directed verdict in regard to the claims for malicious prosecution and false imprisonment. At the close of all the evidence, Ann & Hope renewed its motion with regard to the two remaining claims, and the trial justice again denied it. The jury found in favor of Soares and awarded her $75,000 in damages. Ann & Hope subsequently filed a motion for a new trial, which the trial justice denied.

Ann & Hope asserts several grounds for appeal. It claims that the trial justice erred

by (1) granting Soares's motion in limine with respect to evidence concerning her possession of marijuana, (2) denying its motion for a directed verdict on the count of malicious prosecution, and (3) denying its motion for a new trial on the grounds that the damages were excessive and the verdict was tainted by prejudice, sympathy, or bias.

Additionally, Soares cross-appeals several issues. She argues that the motion justice erred by denying her motion to amend her complaint to join her husband as a plaintiff and to incorporate his claim for loss of consortium. She also asserts that the trial justice erred by (1) preventing the jury from considering punitive damages and (2) granting Ann & Hope's motion for a directed verdict regarding her negligent-supervision claim.

■ The first issue that we address is whether the trial justice erroneously denied Ann & Hope's motion for a directed verdict on the malicious-prosecution count. Ann & Hope argues that two crucial elements of malicious prosecution, specifically malice and lack of probable cause, were not established. It contends that Soares failed to present any evidence to show that the criminal proceeding was initiated with "malice." Ann & Hope asserts that the trial justice's reasons for concluding that there was insufficient evidence to justify a punitive-damage award also support its argument that Soares did not prove malice.

The trial justice determined that Ann & Hope's actions did not indicate that oppressiveness or hostility was directed toward Soares. He also concluded that "[t]here simply is not sufficient evidence to rise to that level to give rise to something approaching criminality." Although Ann & Hope states that malice may be inferred from a lack of probable cause, the inference is impermissible when the evidence indicating a lack of probable cause also indicates a lack of ill will or oppression.

With respect to the element of lack of probable cause for initiating a criminal proceeding, Ann & Hope argues that Soares failed to prove that the criminal proceeding was initiated without probable cause or that Daniels's belief after observing Soares's behavior was unreasonable. It contends that she is trying to prove lack of probable cause from the failure of the criminal action.

Soares argues that the trial justice correctly denied Ann & Hope's motion for a directed verdict on her malicious-prosecution claim. Soares maintains that sufficient evidence existed to establish a prima facie case of malice. She asserts that because her testimony conflicted with Daniels's testimony, the trial justice properly submitted the malice issue to the jury. Soares also contends that the jury could have inferred malice from Ann & Hope's reckless and oppressive conduct. Additionally, in refutation of Ann & Hope's argument, she contends that the jurors did not infer malice simply from her acquittal from the shoplifting charge because they sent the trial justice a note during their deliberations requesting an explanation of how malice could be inferred from a lack of probable cause.

Soares also contends that Ann & Hope's argument regarding malice and lack of probable cause is "irrelevant" because Ann & Hope does not challenge the jury's verdict regarding the false-imprisonment claim. She reasons that the reasonable-grounds standard for establishing false imprisonment is based on the same reasonable-person standard for probable cause to initiate criminal proceedings. She claims that when one views the evidence in the light most favorable to her, one finds sufficient evidence existed to show that Ann & Hope lacked probable cause to initiate criminal proceedings against her.

■ It is well-settled law that when this court is asked to review a trial justice's ruling on a motion for a directed verdict, which is provided for by Rule 50 of the Superior Court Rules of Civil Procedure, we perform the same analysis as is required of the trial justice. *See, e.g., Pickwick Park Ltd. v. Terra Nova Insurance Co.*, 602 A.2d 515, 518 (R.I.1992); Super. R. Civ. P. 50. The trial justice must examine the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses. *See Pickwick*, 602 A.2d at 518; *Kennedy v. Tempest*, 594

A.2d 385, 387–88 (R.I.1991). The trial justice also may draw from the record only those reasonable inferences that support the non-movant's position. *See Pickwick*, 602 A.2d at 518; *Kennedy*, 594 A.2d at 388. If after conducting this analysis, the court finds that there exist issues of fact upon which reasonable minds could differ, the motion must be denied and those issues must be submitted to the jury. *See Pickwick*, 602 A.2d at 518.

■ We now apply this standard to consider whether the trial justice erroneously denied Ann & Hope's motion for a directed verdict on the malicious-prosecution claim. To recover for damages for the intentional tort of malicious prosecution, a plaintiff must prove the following four elements: (1) that the defendant initiated a prior criminal action against him or her, (2) that the defendant lacked probable cause to initiate that proceeding, (3) that the defendant brought the proceeding "maliciously," and (4) that the proceeding terminated in the plaintiff's favor. *See Solitro v. Moffatt*, 523 A.2d 858, 861–62 (R.I.1987). Historically, suits alleging malicious prosecution have been disfavored because of the belief that they may deter the prosecution of crimes. *See id.* at 862. A higher standard of proof, "clear proof," is therefore required for the elements of lack of probable cause and malice. *See id.*

The trial justice explained in his instructions to the jury that of the four elements, two were "given." Specifically, he indicated that Ann & Hope's initiation of a criminal proceeding against Soares was undisputed and that this proceeding had terminated in her favor. Therefore, with respect to the malicious-prosecution claim, the jury was left to consider whether Ann & Hope had probable cause to institute the criminal proceeding and whether it instituted the proceeding with "malice."

■ We first discuss probable cause. This court has held that "probable cause exists when facts and circumstances would lead an ordinarily prudent and careful person to conclude that the accused is guilty." *Id.* (citing *Quinlan v. Breslin*, 61 R.I. 327, 330, 200 A. 989, 991 (1938)). A plaintiff in a malicious-prosecution action must prove the lack of probable cause, that is, that the facts

known to the person who initiated the criminal proceeding did not provide reasonable grounds to believe that the accused committed criminal activity. *See Solitro*, 523 A.2d at 862.

With respect to the next element, this court has held that malice "may be established by a showing that the person initiating the original action was actuated by a primary motive of ill will or hostility, or did not believe that he [or she] would succeed in that action." *See Nagy v. McBurney*, 120 R.I. 925, 929, 392 A.2d 365, 367 (1978). A plaintiff is not required to prove "actual ill will." *See id.* "[A] hostile motive may also be inferred from a showing of a lack of probable cause * * * but may not be drawn from the 'mere failure' of the original action." *Id.* at 929–30, 392 A.2d at 367.

Soares testified that the sneakers that she wanted to buy for Joey lacked a price sticker. It is uncontroverted that she placed a price sticker on the tag. She stated at trial that she thought she had found the correct price sticker in the box and that she had informed Daniels of this belief in the store. Both she and Daniels testified that she offered to pay any difference between the price of the sneakers and the price on the tag that she thought belonged on the sneakers. Daniels testified that he did not know or see where she had found the price sticker and that he did not check to see whether a price sticker was missing from a pair of sneakers. He also stated that he did not review the store videotape to determine whether Soares had been captured on film committing this alleged shoplifting.

Viewing the evidence in the light most favorable to Soares, the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, we conclude that issues of fact upon which reasonable minds could differ existed and that the trial justice correctly so concluded. *See Pickwick*, 602 A.2d at 518. Our review of the record indicates that there was evidence from which the jury could reasonably have concluded that Ann & Hope initiated criminal proceedings without probable cause. The jury could thereby have inferred malice or determined

that Ann & Hope acted with malice. We therefore hold that the trial justice properly denied Ann & Hope's motion for a directed verdict with regard to Soares's malicious-prosecution claim.

In her cross-appeal, Soares also raises a directed-verdict issue, and for the sake of efficiency, we now address it. She claims that the trial justice erred by granting Ann & Hope's motion for a directed verdict on her claim for negligent supervision. Soares contends that Ann & Hope had a duty to conduct an independent investigation of the security guard's allegation that Soares had shoplifted and that Daniels's superiors had a duty to review the allegation with her. Therefore, she argues, Ann & Hope breached its duty and negligently supervised its employee.

Ann & Hope argues that the trial justice correctly granted its motion for a directed verdict on Soares's negligent-supervision claim. Ann & Hope contends that Soares failed to sustain her burden of proof and that she presented no evidence regarding Ann & Hope's procedures or policy for hiring, training, or supervising its employees, among other things.

This court has "recognize[d] the direct liability of an employer to third parties who are injured by acts of unfit, incompetent, or unsuitable employees." *See Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's, Inc.*, 474 A.2d 436, 438 (R.I.1984). In *Welsh*, the plaintiff alleged that the defendant, a security guard company, had been negligent in the hiring, training, supervision, or assignment of a guard who was later found to have coconspired in three thefts of gold; the plaintiff also claimed that this negligence was the proximate cause of its losses in connection with the thefts. *See id.* at 437–38. The plaintiff presented evidence concerning the lack of a formal training program, the defendant's cursory prehiring investigation of the guard, and other such proof of its allegations. *See id.* at 442–43. This court held that the trial justice correctly submitted these issues to the jury instead of granting a directed verdict in the defendant's favor. *See id.* at 441–43.

In contrast to *Welsh*, however, this record does not contain any evidence regarding the hiring, firing, or supervision policies of Ann & Hope, either in general or with respect to Daniels in particular. Consequently, viewing the evidence (or lack thereof) in the light most favorable to the nonmoving party, Soares, we conclude that no issues of fact existed with regard to this claim such that reasonable minds could have differed. *See Pickwick*, 602 A.2d at 518. Thus, the trial justice correctly granted Ann & Hope's motion for a directed verdict on this claim.

The next issue that Ann & Hope raises is whether the trial justice erred by denying its motion for a new trial on the grounds that the damages were excessive and the verdict was tainted by prejudice, bias, or sympathy. Soares appeals a related issue, that is, whether the trial justice erred by refusing to instruct the jury on punitive damages. We discuss these issues sequentially because the arguments and the analysis overlap to some degree.

Before addressing Ann & Hope's new-trial issue, however, we briefly discuss Soares's argument that Ann & Hope should be barred from arguing any issues relating to its motion for a new trial because it failed to comply with this court's procedural requirements. She contends that Ann & Hope failed to cause the transcript of the hearing on its motion for a new trial to be transmitted to this court when it appealed, as required by Rule 10 of the Supreme Court Rules of Appellate Procedure. Soares also asserts that she never received notice that Ann & Hope sought to "supplement" the record by including the transcript of that proceeding. She claims that Ann & Hope has demonstrated a "persistent and aggravated failure to comply" with this court's requirements and that therefore these issues should be dismissed.

Rule 10(b)(1) provides that "the appellant shall order from the reporter a transcript of such parts of the proceedings not already on file as the appellant deems necessary for inclusion in the record" within ten days after filing the notice of appeal. This subsection also requires that the appellant file and serve on the appellee a description of the parts of

the transcript that the appellant intends to include in the record, within the time provided, "[u]nless the entire transcript is to be included." *Id.*

The record reflects that Soares is patently incorrect in alleging that Ann & Hope failed to cause the transcript to be transmitted to this court at the time it took this appeal. Ann & Hope filed its notice of appeal with the Superior Court on December 31, 1992. Its order for transcript for the entire trial proceedings (excluding jury impanelling) and the motion for a new trial bears the file stamp of the Superior Court clerk and the date January 6, 1993. This clearly falls within the ten-day window.

Furthermore, the rule mandates that the appellant notify the appellee *unless* the whole transcript is to be included. We have no indication that it was not the entire transcript that was to be included, as the order form requested the entire trial proceedings and the hearing on the motion for a new trial. (Another form, also filed on January 6, 1993, requests the transcript for the hearing before the motion justice.) Therefore, it appears that Ann & Hope did not violate this section of the rule either.

Soares also asserts that Ann & Hope never notified her that the transcript of the hearing on the motion for a new trial was filed with the Supreme Court. She maintains that only when speaking with a person in the Supreme Court clerk's office in October 1993 did she learn that the transcript had been filed on September 15, 1993.

█ Our rules require that the record on appeal, including the transcript necessary for the appeal's determination, be transmitted to the Supreme Court within sixty days after the notice of appeal has been filed, unless the time is extended (or reduced) by court order. Sup.Ct. R.App. P. 11(a). The rules also mandate that the appellant serve notice of the filing of the transcript on all other parties. *See id.* Rule 11(c) authorizes the trial court or this court to alter the time for transmitting the record upon motion or request in certain circumstances. The Supreme Court clerk shall file the record upon receiving it and shall notify the parties. At that point, the Supreme Court clerk shall also docket

the appeal. *See* Sup.Ct. R.App. P. 12(a) and (b).

The Superior Court docket sheet reflects the granting of a motion to extend the time for transmitting the record to April 6, 1993. This matter was docketed in the Supreme Court in March 1993. Both parties moved for an extension of the period in which they could file their prebriefing statements in this court. Both indicated in their motions that this case was docketed before the entire transcript had been filed. The record reflects that this assertion is correct. The transcript of the hearing on the motion for a new trial bears the Supreme Court clerk's office stamp with the date September 15, 1993. We do not know whether Ann & Hope complied with Rule 11(a) by notifying Soares once the new-trial transcript was filed. We do not think, however, that this court's docketing oversight should operate to prejudice either party or to bar Ann & Hope from addressing the motion for a new trial.

We now address the motion for a new trial, first by recounting some relevant aspects of the trial. At Ann & Hope's objection and because Soares was not going to offer expert testimony, the trial justice limited the scope of the direct examination by Soares's counsel regarding her damages—mental anguish—to the period of confinement up to the disposition of the criminal charge in Massachusetts, approximately four months. The trial justice decided not to charge the jury regarding punitive damages. He instructed the jurors that if they found Ann & Hope liable to Soares for malicious prosecution, false imprisonment, or both, they could consider awarding damages to Soares for the deprivation of her freedom, the loss of time, inconvenience, physical discomfort, humiliation, or mental suffering that she experienced as a result. He stated:

> "There is no formula for calculating an award. It's not easy to measure. You simply must determine what in your mind constitutes *fair and adequate compensation for the injuries that she sustained as a result of the defendant's conduct.* * * * Prejudice, sympathy, and compassion have

no place in your deliberations." (Emphasis added.)

As noted above, the jury found Ann & Hope liable for both malicious prosecution and false imprisonment and awarded Soares $75,000 in compensatory damages.

Ann & Hope moved for a new trial on the grounds that the verdict was against the law, against the evidence, grossly excessive, and failed to do substantial justice between the parties. The trial justice denied the motion. With regard to the liability, he concluded that there was a "sufficient basis for a fact finder to conclude that in fact the defendant is liable to the plaintiff under either theory of recovery." As for damages, he stated that "seventy-five thousand dollars given the fact that they obviously believed her testimony, and they believed that she was falsely imprisoned, and they believed through both direct evidence and the inferences reasonably to be drawn therefrom in fact she was maliciously prosecuted notwithstanding the restrictions on any award were limited to a three to four month period, seventy-five thousand dollars *does* not shock my conscience and therefore I don't believe the award to be excessive."

■ Ann & Hope argues that $75,000 is disproportionate to any injury that Soares may have suffered. It maintains that, given the four-month limit on her damages, Soares received approximately $4,500 per week or $646 per day. Ann & Hope claims that Soares was "not disabled," she experienced no permanent injury, and she offered no evidence of any financial loss. Ann & Hope further asserts that the jury was influenced by sympathy, passion, and prejudice in awarding excessive damages. It contends that a new trial on damages and liability is warranted because there is no guarantee that the jury's verdict regarding liability was not similarly tainted by sympathy, passion, and prejudice.

Soares argues that Ann & Hope failed to establish that the trial justice overlooked or misconceived material evidence or was clearly wrong by denying its motion for a new trial. She contends that although the trial justice decided to limit her testimony to the four-month period between her arrest and the criminal trial, Ann & Hope's cross-examination and Soares's redirect examination expanded the scope of her injuries to be considered. Ann & Hope elicited testimony from Soares regarding her anxiety and nervousness at the time of her deposition in May 1990. She asserts that the evidence before the jury therefore showed that she suffered mental anguish and anxiety for at least two years subsequent to her arrest. She claims that she was devastated and deeply traumatized by her experience. Thus, she maintains, the trial justice correctly denied Ann & Hope's motion for a new trial on damages.

■ When a trial justice considers a motion for a new trial, he or she must exercise independent judgment and review all the material evidence in light of his or her instructions to the jury, evaluating the weight of the evidence and the credibility of the witnesses. *See Pickwick,* 602 A.2d at 520. Then the trial justice must determine whether reasonable minds may differ with respect to the evidence. *See id.* If so, the trial justice should let the verdict stand. *See id.* If, however, the trial justice concludes that the verdict is incorrect " 'because it fails to respond to the merits and to administer substantial justice between the parties or is against the fair preponderance of the evidence, he [or she] should set aside the jury's verdict and order a new trial.' " *Id.*

■ As long as the trial justice has conducted this evaluation, this court will reverse a trial justice's ruling on such a motion only if he or she " 'overlooked or misconceived *material evidence or was otherwise clearly wrong.' " Id.* Furthermore, even if this court determines that the trial justice erroneously performed this function, we shall not set aside the jury's verdict if we find competent evidence to support the verdict after reviewing the record in the light most favorable to the prevailing party. *See id.* at 521.

Ann & Hope reasons that its motion for a new trial should have been granted on the ground that the verdict was excessive because it was tainted by sympathy, bias, or prejudice. Thus, we direct our analysis first to the damages then to the liability.

We note that "[t]he task of assessing compensatory damages is peculiarly within the province of the jury." *Paquin v. Tillinghast,* 517 A.2d 246, 249 (R.I.1986). The trial justice may order a new trial on damages if he or she independently concludes "that the award is so excessive in comparison to the injuries sustained as to fail to work substantial justice between the parties." *Id.*

Applying these standards, our review of the record leads us to conclude that the trial justice was clearly wrong in determining that the jury's award of $75,000 in "compensatory" damages was not grossly excessive and influenced by passion or prejudice. *See id.* Even though the trial justice correctly instructed the jurors that no formula existed to guide their calculation of damages, we think that the award failed to do substantial justice between the parties because it was so excessive in relation to the injuries that Soares sustained. *See id.*

Soares testified that she suffered from a loss of confidence and that she felt anxious and less interested in being around people. She feared losing her job, friends, and family. She testified that she was shocked and upset to have been arrested in front of her five-year-old son and that "all [her] privacy" was taken from her when she was at the police station and was placed in a cell. She suffered an upset stomach and vomiting when she thought about her upcoming trial. She stated that she did not seek medical attention.

We do not belittle the harm that Soares suffered. The record reflects that she experienced a demeaning, frightening, humiliating, and anxiety-inducing incident and aftermath, including detention and a criminal trial on a shoplifting charge of which she claimed to be innocent. We suspect, however, that the jury awarded her $75,000 not merely to compensate her for her harm but also to punish Ann & Hope. We think that this is especially likely because the jury was not instructed regarding punitive damages. Although we have no particular amount in mind, we think that the jurors were influenced by sympathy or bias that motivated them to award an amount far in excess of what would have fairly compensated Soares

for her injuries. We therefore conclude that the trial justice erred in denying a new trial for damages.

Despite Ann & Hope's argument to the contrary, however, our conclusion that the damages were excessive does not necessarily require that we remand for a new trial on liability as well. Ann & Hope cites *Mouchon v. Erikson's, Inc.,* 448 A.2d 776, 779 (R.I. 1982), for the proposition that we have "recognized that when an award of damages is sufficiently excessive to indicate that the jury was motivated by sympathy, passion, and prejudice, a new trial on the issue of liability is required." The *Mouchon* court then quoted the following statement of this court in *Lornitzo v. Rhode Island Hospital,* 79 R.I. 455, 460, 89 A.2d 831, 833 (1952): "When prejudice or other improper influences of this kind are found by the trial justice to have operated to the extent above mentioned, it is difficult to determine with reasonable certainty where they end." 448 A.2d at 779.

The case at bar is distinguishable from *Lornitzo* on its facts. *Lornitzo* fell at an extreme end of the spectrum of improper influences. The trial justice there found that the plaintiff had exaggerated his injuries and had acted before the jury. *See Lornitzo,* 79 R.I. at 459–60, 89 A.2d at 833. We do not think that the level of improper influences in this case rises to the level that justified a new trial on liability as well as damages in *Lornitzo* or other cases.

Furthermore, this court has held that a new trial may be granted on the issue of damages in circumstances in which the finding of liability was supported by the evidence but the damages award appeared to have been motivated by passion or prejudice. *See Mazzaroppi v. Tocco,* 533 A.2d 203, 205 (R.I. 1987). The case at bar is more similar to *Mazzaroppi* than to *Lornitzo.* Because he did not overlook or misconceive material evidence and was not otherwise clearly wrong, we conclude that with regard to liability, the trial justice correctly denied Ann & Hope's motion for a new trial. *See Pickwick,* 602 A.2d at 520–21. Moreover, we find competent evidence to support the jury's verdict with regard to liability. *See id.*

We now address Soares's contention that the trial justice erroneously refused to allow the jury to consider punitive damages. Soares advances three reasons that this constituted error. First, she argues that "it is a non sequitur" to permit the jury to consider the malicious-prosecution claim but not the claim for punitive damages. She contends that if prima facie evidence existed with respect to the elements of malicious prosecution, then prima facie evidence also existed with respect to punitive damages. Second, Soares maintains that the trial justice overlooked or misconceived material evidence in his decision on punitive damages, and that the record contains sufficient evidence to show that Ann & Hope's actions were "intentional and/or grossly reckless" so as to warrant the jury's consideration of awarding punitive damages. Third, Soares asserts that pursuant to G.L.1956 (1981 Reenactment) § 12–7–14 the trial justice should have permitted the jury to consider punitive damages.

Ann & Hope agrees with the trial justice's refusal to permit the jury to consider punitive damages. It frames its argument, however, to claim that the trial justice did not err in granting the motion for a directed verdict on the issue of punitive damages because the record lacked sufficient evidence to prove malicious, willful, and reckless conduct by it. It argues that the determination whether a case is appropriate for punitive damages is a question of law for the court, and then, if the issue is submitted to the jury, it is within the jury's discretion. It further asserts that the statute on which Soares relies in part does not require an award of punitive damages but rather maintains the discretionary nature of the decision.

Our review of the record indicates that the trial justice denied Soares's request to instruct the jury regarding punitive damages when deciding whether to admit Ann & Hope's financial statements into evidence. Ann & Hope objected to the admission of the statements on the ground that they would be relevant only if the jury were to be instructed regarding punitive damages; Ann & Hope then asserted that the evidence in this case did not merit such an instruction.

The trial justice sustained Ann & Hope's objection to the admission of the financial statements and decided not to instruct the jury on punitive damages. He reasoned that "the evidence [was] not sufficient to indicate that there [was] anything approaching a level of criminality that would permit a fact finder to consider an award of punitive damages." He also concluded that § 12–7–14 made punitive damages discretionary and questioned whether the statute applies to a civil action because it is found in the section of the General Laws relating to criminal procedure.

On the penultimate and final days of trial, Soares filed jury instructions that encompassed several proposed instructions regarding punitive damages. In the trial justice's charge to the jury, he did not include any instruction concerning punitive damages. He then asked counsel at sidebar whether they had any objections to the charge as given or regarding matters omitted. Soares's counsel raised the issue of rehabilitating a witness through prior consistent statements and stated that he had no other objection.

Before we address the merits of this issue, we briefly discuss a threshold consideration. Rule 51(b) of the Superior Court Rules of Civil Procedure provides that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." This rule's purpose is to provide the trial justice an opportunity to "'make any necessary corrections'" in the charge. *Brodeur v. Desrosiers,* 505 A.2d 418, 422 (R.I.1986). This court has stated that we "will not use rigid adherence to Rule 51(b) as a vehicle for overlooking trial errors." *See id.* We have also specified that "a trial justice's refusal to charge * * * can be assigned as a ground of appeal only if a request was made to charge differently or if objection was made to the charge as given." *See Belanger v. Silva,* 120 R.I. 19, 27, 384 A.2d 605, 610 (1978). Although Soares did not object to the charge after the trial justice issued it, she had requested instructions concerning punitive damages. We therefore

proceed to consider the instruction issue itself.

The instructions that the trial justice gives to the jury must be applicable to the facts in evidence. *See Brodeur,* 505 A.2d at 422. An erroneous jury charge, however, merits reversal only if it can be demonstrated that the jury " 'could have been misled' to the resultant prejudice of the complaining party." *Id.* (quoting *Anter v. Ambeault,* 104 R.I. 496, 501, 245 A.2d 137, 139 (1968)).

We now determine whether an instruction regarding punitive damages would have been applicable to the facts in evidence. We first note that punitive damages serve two purposes: punishing tortfeasors who commit intentional or malicious wrongful conduct and deterring such conduct in the future. *Palmisano v. Toth,* 624 A.2d 314, 317–18 (R.I. 1993). They generally are considered an extraordinary sanction and are regarded with disfavor, but they are allowed "if awarded with great caution and within narrow limits." *Id.* at 318.

Whether the facts of a case suffice to support a punitive-damages award is a question of law for the court. *See id.; Sherman v. McDermott,* 114 R.I. 107, 108, 329 A.2d 195, 196 (1974). This court has held that a party seeking an award of punitive damages bears the burden of producing " 'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.' " *Palmisano,* 624 A.2d at 318 (quoting *Sherman,* 114 R.I. at 109, 329 A.2d at 196). The plaintiff must show that the defendant acted with malice or in bad faith. *See id.* If the trial justice determines that adequate facts exist to support such an award, it is in the discretion of the trier of fact to decide whether to make such an award and in what amount. *See id.*

We think that the trial justice erroneously denied Soares's request to instruct the jury regarding punitive damages because adequate facts existed to support such an award. He had already determined that there was evidence from which the jury could conclude that Ann & Hope acted with malice in his decision not to grant Ann & Hope's motion for a directed verdict on the malicious-prosecution count. Although this would not necessarily be dispositive in every case, we think that the evidence in *this* record sufficed for submitting both the malicious-prosecution and the punitive-damages issues to the jury.

The evidence in the case conflicts, but both Soares and Daniels testified that she offered to pay the difference, which according to the two sums to which Daniels testified amounted to $3.75. Daniels testified that Ann & Hope had a "one-hundred-percent apprehension" policy. This meant that "[y]ou had to be a hundred percent positive before you could make [an] apprehension. * * * Basically, you had to see everything happen with your own two eyes." He also testified that he lost sight of Soares for approximately five to ten seconds. He estimated that more than 90 percent of those people suspected of shoplifting at Ann & Hope are prosecuted for shoplifting. He stated that the manager has the option of releasing someone, and in such a case the person could pay the difference in price. He testified that his supervisor, who was present when Soares offered to pay the price difference, left the room, reviewed this situation with the manager, and returned with a direction to call the Seekonk police.

Other evidence included Daniels's testimony that he did not review the store's videotape or check to see whether any price tag was missing. He did not see where Soares had obtained the adhesive price tag—her back was facing him at that time. We conclude that with respect to both the false-imprisonment claim and the malicious-prosecution claim plaintiff showed that Ann & Hope acted with "malice." *See Palmisano,* 624 A.2d at 318. Therefore, he should have submitted the issue of punitive damages to the jury for both claims because such an instruction would have applied to the facts in evidence. *See Brodeur,* 505 A.2d at 422.

With regard to the false-imprisonment claim in particular, however, the trial justice had yet another reason to instruct the jury regarding punitive damages, namely, § 12–7–14. Section 12–7–14 states that "[i]n an action for false arrest or false imprisonment, the plaintiff, if successful, may be awarded

punitive damages in addition to compensatory damages."

First, we should clarify that although this section is located in the criminal-procedure title of the General Laws, it refers to the torts of false imprisonment and false arrest. It also speaks in the language of civil lawsuits, using such terminology as "plaintiff," "damages," and "compensatory." This statute clearly applies in civil cases.

Second, the trial justice was correct in interpreting the statute as rendering the awarding of punitive damages discretionary, but he erred in concluding that it was he who had the discretion. The statute provides that punitive damages may be awarded in a false-imprisonment case. Further, as noted above, it is within the discretion of the trier of fact whether to award punitive damages and, if so, in what amount. *See Palmisano*, 624 A.2d at 318. In our view, the statute removes the discretion from the trial justice with regard to submitting the issue of punitive damages to the jury. In other words, if a trial justice finds sufficient evidence to allow an underlying claim of false imprisonment or false arrest to be submitted to the jury, then if punitive damages are sought, the punitive-damages issue must go to the jury as well.

We shall not be so categorical about malicious-prosecution claims. We do not hold that a punitive-damages instruction is warranted in every malicious-prosecution case that is submitted to the jury. We do, however, find that in this case the evidence was such that it supported a punitive-damages instruction. Consequently, the trial justice erred by refusing to instruct the jury on punitive damages for several reasons. We think that the jurors in this case awarded Soares damages so excessive in relation to her injuries and what would have compensated her that they gave her a de facto award of punitive damages.

Relying on our conclusions that the trial justice erred by not granting a new trial on damages and that he should have instructed the jury regarding punitive damages, we vacate the award of damages and order that the Superior Court hold a new trial on damages only. *See Palmisano*, 624 A.2d at 320–

21; *Mazzaroppi*, 533 A.2d at 205. Because we are remanding for a new trial on damages only, we do not discuss whether the error in the jury charge would warrant reversal, that is, whether the jury could have been misled to Soares's prejudice. *See Brodeur*, 505 A.2d at 422.

The penultimate issue is Soares's contention that the motion justice erred by denying her motion to amend her complaint with regard to joining her husband, Joseph, as a second plaintiff and adding his claim for loss of consortium. The motion justice denied the amendment because the statute of limitations had run.

■ Soares argues that the motion justice should have permitted the amendment because a loss-of-consortium claim is derivative and does not accrue until the underlying claim has been proven. Specifically, Soares contends that the statute of limitations on this claim began to run after the jury had returned its verdict in her favor.

Ann & Hope asserts that the motion justice correctly denied the amendment because the statute of limitations had expired. It maintains that under *Normandin v. Levine*, 621 A.2d 713 (R.I.1993), the assertion of the injured spouse's cause of action within the statute of limitations does not excuse the failure of the spouse claiming loss of consortium from complying with the statute of limitations, even though the latter claim is derivative from the former.

General Laws 1956 (1985 Reenactment) § 9–1–41(a), as amended by P.L.1988, ch. 544, § 1, provides that a married person is entitled "to recover damages for loss of consortium caused by tortious injury to his or her spouse." Section 9–1–41(d) specifies, however, that "[a]ctions under this section *shall be brought within the time limited under § 9–1–14 or [§] 9–1–14.1, whichever is applicable,* for actions for injuries to the person." (Emphasis added.) Section 9–1–14(b) requires that actions for personal injuries "be commenced and sued" within three years after the cause of action accrues.

■ Our general rule is that a cause of action accrues and that therefore the stat-

ute-of-limitations clock starts ticking at the time that an injury occurs. *See Swiss v. Eli Lilly & Co.*, 559 F.Supp. 621, 624 (D.R.I. 1982). Although a cause of action for loss of consortium "arises from" the injured spouse's injury and depends on the success of the underlying tort claim, *see Sama v. Cardi Corp.*, 569 A.2d 432, 433 (R.I.1990), the statute of limitations begins to run at the time that the injury occurred to the injured spouse. As we have stated:

> "[E]ach spouse maintains an entirely unique cause of action under the law and the assertion of one spouse's right within the statutory period of limitations will not excuse the failure of the other spouse to assert within the statute of limitations his or her own separate right." *Normandin*, 621 A.2d at 716.

In the case at bar, Soares concedes that her motion to amend "was filed and heard subsequent to the three year anniversary of [her] false imprisonment." She argues that the loss-of-consortium claim did not accrue and the statute of limitations did not begin running until the jury found in her favor. Although a somewhat creative argument, this is simply an incorrect statement of the law. We therefore hold that the motion justice correctly denied this amendment because the loss-of-consortium claim was time-barred. We do not reach other arguments advanced by the parties on this issue.

The final issue for review is whether the trial justice erred by granting Soares's motion in limine. We do not discuss the merits of this issue since we affirm this ruling by an evenly divided court.

For the above reasons, the defendant's and the plaintiff's appeals are sustained in part and denied in part. The judgment of the Superior Court is affirmed in part and reversed in part. This matter is remanded to the Superior Court for further proceedings consistent with this opinion.