HELENA M. JAMES *vs.* R. I. AUDITORIUM, INC.

MAY 5, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J.  This is an action of trespass on the case for negligence.  It was tried before a justice of the superior court, sitting with a jury, and resulted in a verdict for the plaintiff for $500.  The case is before us solely on the defendant's exception to the denial by the trial justice of its motion for a directed verdict, all other exceptions being expressly waived.

The defendant maintains and operates the Rhode Island Auditorium, in the city of Providence, as a place for public use, entertainment and assembly, "capable of being used for skating and other ice sports."  The plaintiff, who had paid the required admission fee, claims to have been struck and injured by a "flying hockey puck" while witnessing a hockey game between two professional teams which were playing under the defendant's supervision in that building on the evening of November 28, 1935.  The plaintiff contends that the defendant is liable because it failed to protect her against such injury by screening that part of the auditorium where she was seated, or to warn her of the danger to which she was exposing herself by occupying the seat that the defendant had provided for her as a spectator.

Ice hockey as played on artificial ice in auditoriums or rinks is known mainly to those who have witnessed the game

in such places. The construction of the rink and the object of the game is not so general as to be a matter of common knowledge. The testimony in the instant case shows that the playing surface in the defendant's auditorium is one hundred ninety-two feet long and eighty-five feet wide, with a "cage" as the goal at each end; that there is a dashboard around the rink fifty-two inches high from the ice surface to the top rail of the dashboard; that the dashboard at both ends of the rink and behind the goals has a wire screen on top of the dashboard for its entire length, the combined height of dashboard and screen being ten feet, five inches; that there is no screening of any kind above the dashboard on the sides of the rink; and that seats, in rising tiers, are provided for the spectators behind the dashboard on all sides of the rink.

The testimony further shows that in a hockey game the players of the opposing sides, using a long curved stick, try to drive a hard rubber block or disk, about one inch thick and three inches in diameter, known as a "puck", *along* the ice and into the opponent's cage or goal. The screen above the dashboard behind each goal is placed there to protect the spectators at both ends of the playing surface from the danger of being struck by a "flying puck", which means a puck that leaves the playing surface of the rink.

The plaintiff's testimony, in substance, is that she and her husband, residents of New London, Connecticut, came to Providence to spend Thanksgiving Day with some friends; that she had never seen a professional hockey game played in a rink and was, therefore, unaware of any danger to a spectator in connection with such a performance; that on the evening in question she was one of a party that had purchased box seats for the game at the auditorium, which seats were behind the dashboard on the side of the rink and close to the playing surface; that she occupied the seat indicated by her ticket, and that, while she was so seated watching the

game, she was struck in the face by the puck and suffered substantial injury.

The principal witness for the defendant was the architect and engineer under whose direction its auditorium was built. His testimony, as an expert in the construction of skating rinks for professional hockey games, is that the rink in the defendant's building was similar to all other such rinks that he had constructed, which included the Madison Square Garden in New York and the Boston Garden; that there is no definite standard as to the length or width of rinks for in this respect "Hockey is different from base ball"; and that he had *"tried* to standardize *everything* in ice-rink construction" since he built the Madison Square Garden in 1908 and rebuilt it in 1920. (italics ours)

The testimony of the defendant's general manager, in so far as material to the issue before us, is that three thousand one hundred thirty-three tickets were printed for the game in question, with prices of $1.50 and $1.35 for seats along the sides and of $1.00 for nine hundred eight seats at the ends behind the "wire netting screen behind the goal"; that some one hundred sixty of these latter seats remained unsold, any one or more of which might have been occupied by spectators lawfully on its premises; that the defendant had charge of the seating arrangement on the evening of the accident, and that there were no signs about the rink warning of danger from a flying puck, which danger was not obvious to one who may not have been acquainted with the game. This witness further testified as follows: Q. "The puck is propelled up and down the rink ordinarily, but in some of the games do they (meaning pucks) fly off the sides?" A. "Occasionally." Q. "You have knowledge of that, haven't you?" A. "I have seen pucks go into the stands at times."

In this state of the evidence the defendant moved for a directed verdict, which was denied. Upon the denial of this motion, the trial justice left it for the jury to determine whether the defendant was negligent and also whether the

plaintiff assumed the risk of injury from a flying puck by occupying the seat which had been sold to her by the defendant, especially if they believed her testimony that she was ignorant of any danger from such cause. The jury, as already stated, found in favor of the plaintiff.

In an action of trespass on the case for negligence against the proprietor or operator of a place of amusement, an invitee for compensation is ordinarily entitled to the exercise of reasonable care by the defendant in protecting such invitee against dangers which the defendant knew or reasonably should have foreseen in the exercise of such care. An invitee ordinarily assumes the risk of an obvious danger or of one that is a matter of common knowledge; conversely, such a person does not assume the risk of a hidden or undisclosed danger, not of common knowledge, in the absence of warning or personal knowledge. The defendant in the instant case was not required to anticipate and protect the plaintiff against the unlikely or the improbable, but it was bound to use such measures and means, in the use of its premises, as the ordinary prudent person, in its position and with its knowledge of hockey games, would have reasonably employed in protecting an invitee from dangers reasonably to be apprehended.

The defendant strongly contends that the trial justice erred in denying its motion for a directed verdict on the facts in this case. It directs our attention particularly to three cases, two in New York and one in Canada. The plaintiff, in opposing the defendant's contention, relies mainly on a recent Massachusetts decision. The cases cited by both parties present facts quite similar to those in the instant case. In all of the cases cited to us, the plaintiff, a spectator for compensation, was injured by a flying puck while sitting in an unscreened portion of a hockey rink. An examination of the grounds upon which these decisions rest is of assistance.

In *Hammel* v. *Madison Square Garden Corp.*, 156 Misc. (N. Y.) 311, (Apr. 25, 1935) the appellate division of the

New York Supreme Court, second department, holds that a directed verdict for the defendant was proper. In a short opinion the court says: "No case has been found which passes upon this exact situation. There are, however, a number of cases where spectators at baseball games have been injured by batted balls coming into the stand. The consensus of opinion in those cases is that there is no liability; that the proprietors of a baseball park are not obliged to screen all the seats; that spectators occupying seats that are not screened assume the risk incident to such use." After citing a number of baseball cases the court concludes by saying: "The baseball cases seem to present the same legal question that confronts us here."

In *Ingersoll* v. *Onondaga Hockey Club, Inc.*, 245 N. Y. App. Div. 137, (June 27, 1935) the appellate division of the supreme court, third department, sustained a nonsuit on facts similar to those in the *Hammel* case, *supra*, but in this instance the court divided three to two. Following the *Hammel* case, the majority opinion, at page 139, says: "It seems to me that appellant in attending a hockey game occupied precisely the same status as a spectator at a baseball game and that the same rules should be applied in each instance. . . . The risk of being hit by a baseball or by a puck at a hockey game is a risk incidental to the entertainment and is assumed by the spectators. . . . It is common knowledge that the puck may leave the ice when the players are shooting for a goal. . . . It is argued that this was the first time she (the plaintiff) had ever attended such a performance. That does not change the rule of liability so far as respondents are concerned. Certainly it was not incumbent upon them to make inquiry of each patron on entering the premises as to whether or not he or she had ever witnessed a like performance."

The minority opinion in the *Ingersoll* case holds that on the facts in evidence it was for the jury to determine whether the defendants had fulfilled their duty of exercising reason-

able care, and quotes the following language of *Lehman, J.* in *Redmond* v. *National Horse Show Ass'n,* 78 Misc. (N. Y.) 383: "Persons invited upon payment of an entrance fee to a place of public amusement have the right to assume that they can go there without incurring any risk, which might have been reasonably anticipated by the proprietor." With hardly any discussion the minority opinion refuses to follow the reasoning in the *Hammel* case, *supra,* saying that there is a "differentiation" between the baseball cases, upon which the decision in that case rests, and the case then before the court.

The third case upon which the defendant relies is *Elliott & Elliott* v. *Amphitheatre Ltd.,* Manitoba, King's Bench, 1934, 3 Western Weekly Reports, 225. The real ground for the decision in this case is that the plaintiff assumed the risk of a danger that was known to him. At page 229 of the opinion, the court says: "There was ample space free from danger behind the screen at both ends of the rink, which the plaintiff could have selected, instead of which he selected a seat in a box in the front row and on a level with the surface of the ice, a seat which he himself said was more dangerous than that immediately behind and higher up. The infant plaintiff (a boy eighteen years old) is himself a hockey player, having played the game for a number of years. He is a boy of average intelligence, knows the dangers incidental to the game of hockey; he knows the construction of the rink in which the game was played and the protection afforded to the spectators. . . . The plaintiffs must be held to have a thorough knowledge of the risks assumed by the public in witnessing games of hockey and the protection customary in such games."

The *Hammel* case, *supra,* and the majority opinion in the *Ingersoll* case, *supra,* in both of which cases the plaintiff was attending a hockey game for the first time and was unaware and unwarned of danger from a flying puck, *assume,* by analogy to the game of baseball, that such danger as an inci-

dent to the game of ice hockey is a matter of common knowledge and is therefore assumed by a spectator who sits in the unscreened portion of the rink. But even the New York court, in the minority opinion in the *Ingersoll* case, begins to doubt the analogy between a hockey game and a baseball game, upon which the decision in the *Hammel* case is made to rest. It is well to note at this point that neither the *Hammel* nor the *Ingersoll* case was reviewed by the New York court of appeals, and no expression of opinion by that court on the point in issue here has come to our attention.

In the *Elliott* case, *supra,* the Canadian court shows considerable caution in its opinion. It reviews the baseball cases and, at page 228 of the opinion, says: "These American cases present views and situations differing from the present case, but they are instructive on the general views on the question of negligence in the realm of sport. Reasonable care is held to be the measure of duty, and the proprietor is held not to be an insurer, and spectators assume the risk peculiar to that form of amusement." When it comes to deal with the case actually before the court, it rests its decision squarely on the ground that the plaintiff knew, through personal knowledge of hockey games, that, by sitting close to the playing surface in the unscreened portion of the rink, he was knowingly exposing himself to the danger of being struck by a flying puck. The decision in this case is carefully restricted to the facts and circumstances then before the court and no more.

In the recent case of *Shanney* v. *Boston Madison Square Garden,* 5 N. E. (2d) 1, upon which the plaintiff relies, the facts were almost the same as those now before us. In that case, as in the instant case, the defendant contended that the danger to spectators at a hockey game from a flying puck was inherent in the nature of the sport itself, and that the risk of such danger was, in effect, an obvious one which a spectator assumes. The New York cases of *Hammel* and *Ingersoll, supra,* and the analogy of the baseball cases were

argued to the court in support of this contention, but the court tersely refused to follow those cases or to adopt the analogy of the baseball cases, saying: "Cases as they arise must be decided by the application of general principles to the particular facts shown and not by arbitrary classification according to the names of various games." Although the Canadian case is not mentioned in the *Shanney* case, it appears to us that the Massachusetts court followed practically the same line of reasoning as the Canadian court did in the *Elliott* case, *supra*, but, on the evidence before it, reached the opposite result. It therefore held that in the circumstances then before the court there was no presumption that the plaintiff appreciated the risk of being struck by a flying puck and sustained a verdict for the plaintiff.

We find considerable difficulty in reaching the conclusion that the average person has a similar knowledge of the risks incident to hockey and to baseball. The games are fundamentally different. In hockey the puck is supposed to be driven *along* the ice towards the goal at each end of the playing surface, while in baseball the ball is pitched through the air to be batted out towards the playing field, far or near, on the ground or in the air, according to the skill of the batter or to chance. The average person of ordinary intelligence in this country is so familiar with the game of baseball that it is reasonable to presume that he appreciates the risk of being hit by a pitched or batted ball without being specially warned of such danger. Therefore, a spectator at this nationally known game may ordinarily be held to have assumed such a risk. It is going quite far to assume, however, that the average person has the same knowledge respecting the risk of being hit by a flying puck in a hockey game played in a specially constructed rink, which, according to the testimony of the defendant's expert, is not yet fully standardized in all details. Furthermore, the game of ice hockey in rinks is of rather recent origin in this country. The dangers incident to the game

may be or become known to those who attend such performances, but we have great difficulty in believing that those dangers are a matter of common knowledge in the community. If speculation were permitted, one might well suppose that the game of ice hockey was generally well known in Canada. Yet, in the *Elliott* case, *supra,* the Canadian court carefully confined itself to the specific facts in the case and avoided saying that *any person* who attended the game assumed the risk of being hit by a flying puck, regardless of his lack of knowledge of such danger.

The evidence in the instant case, which is practically undisputed, shows that the defendant knew and the plaintiff did not know that a spectator, while seated in the unscreened portion of the rink, ran the risk of being hit by a flying puck. In view of the general nature of the game and of the fact that such risk is not an obvious one, we do not feel warranted in presuming that the plaintiff should have appreciated that risk as a matter of common knowledge. In the absence of screening or of reasonable warning by the defendant of an undisclosed danger known to it, but not known to the plaintiff, the latter was justified in believing that the seat indicated by her ticket and which she occupied was reasonably safe from danger

We find no merit in the defendant's argument that, in order to warn a person who attends a hockey game of the danger from a flying puck while sitting in the unscreened portion of the rink, it would have to make inquiry of each person on entering the premises whether such danger was known to him. Warning of a known, undisclosed danger to a person unaware of the existence of that danger may be reasonably given in a number of ways, without resorting to personal inquiry.

The defendant, relying upon the testimony of its expert, argues that it discharged its full duty to its invitees when it constructed its rink like other hockey rinks in various cities. We do not agree with this contention. The prac-

tice in other places and the opinion of the expert in this case are circumstances entitled to proper consideration as -evidence, but they are not conclusive.

The situation in this case is rather unusual. Following the jury's verdict in favor of the plaintiff, the defendant did not move for a new trial but came directly to this court on its exceptions before verdict. At the hearing before us, it relied solely on its exception to the ruling of the trial justice denying its motion for a directed verdict, expressly waiving all other exceptions. In this state of the record, the credibility of the witnesses or the weight of the evidence is not open for consideration. It is well established with us that, on a motion for a directed verdict, the court will consider as true all the evidence submitted on behalf of the adverse party and will resolve all the reasonable inferences from the evidence in favor of the contention of the party opposing the motion. *Young* v. *Young*, 56 R. I. 401.

Applying this principle to the evidence in the instant case, we are satisfied that such evidence, and the reasonable inferences therefrom, presented issues of fact for determination by a jury. In our opinion, the trial court would have erred in directing a verdict for the defendant on the evidence in this case.

The defendant's exception is overruled, and the case is remitted to the superior court for the entry of judgment on the verdict.

*Arthur L. Conaty,* for plaintiff.

*Clifford A. Kingsley, Francis V. Reynolds,* for defendant.