Eileen HENNESSEY et al.

v.

Michael G. PYNE et al.

No. 95–687–Appeal.

Supreme Court of Rhode Island.

May 13, 1997.

Edward L. Gnys, Jr., Christopher M. Rawson, Providence, for Plaintiff.

Mark W. Dana, Daniel McKiernan, James S. D'Ambra, Providence, for Defendant.

Present: WEISBERGER, C.J., and LEDERBERG, BOURCIER, and FLANDERS, JJ.

## OPINION

FLANDERS, Justice.

When hitting a golf ball, does a golfer owe any duty to persons living in residences immediately adjacent to the golf course? If so, is that duty breached when the golfer unintentionally hits a ball that veers off the course, strikes a resident on her own property, and injures her? This appeal from a summary judgment requires us to tee off on these questions for the first time in Rhode Island.[1]

Ever since Mark Twain quipped that golf was nothing more than "a good walk spoiled,"[2] the game of golf has continued to excite flamboyant commentary concerning those who ply its greensward. The famed American curmudgeon, H.L. Mencken, once chipped in that if he had his way, "no man guilty of golf would be eligible to any office of trust or profit under the United States."[3] A different but equally difficult lie has been played by humorist A.P. Herbert, who took this shot: "the game of golf may well be included in that category of intolerable provocations which may legally excuse or mitigate behavior not otherwise excusable."[4]

In assaying the governing standards applicable to this dispute, we shall try to drive a middle course down a legal fairway strewn with hazards, bunkers, and other assorted obstacles—especially to those who venture off aimlessly into the rough. Although we acknowledge that "a golfer ordinarily may not be held liable to individuals located entirely outside of the boundaries of the golf course who happen to be hit by a stray, mishit ball," *Rinaldo v. McGovern,* 78 N.Y.2d 729, 579 N.Y.S.2d 626, 628, 587 N.E.2d 264, 266 (1991), our de novo review[5] of the record reveals material factual questions that prevent the negligence claims in this case from being par for a summary-judgment course. Thus, we conclude that the Superior Court should not have entered judgment in favor of defendant golfer, Michael G. Pyne (Pyne), on the negligence claims of plaintiff, Eileen Hennessey (Hennessey). However, we affirm the summary judgment entered with respect to Hennessey's assault, battery, and nuisance claims.

## Facts[6]

In 1990 Hennessey lived in a condominium right next to the Louisquisset Golf Club, a North Providence golf course. According to Hennessey, "[a]s soon as they started golfing the first time," her condominium was hit by golf balls. Her home nestled in the crook of a dogleg golf hole that swerved slightly to the left from the tee on the eleventh hole. So close was Hennessey's property to the course that her back yard began approximately fourteen feet from the edge of the out-of-bounds marker about half-way down the fairway.[7]

---

1. We directed both parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the arguments of counsel and reviewing their memoranda, we perceive no cause and therefore proceed to decide this matter without further briefing or argument.

2. Attribution quoted in *The Wit & Wisdom of Mark Twain* 89 (Alex Ayres, ed.1987).

3. H. L. Mencken, "Adventures of a Y.M.C.A. Lad" (1894), *in The Vintage Mencken* 18, 19 (Alistair Cooke gatherer, 1990).

4. A.P. Herbert, *Misleading Cases in the Common Law* 20 (4th ed.1928).

5. *See generally Marr Scaffolding Co., Inc. v. Fairground Forms, Inc.,* 682 A.2d 455, 457 (R.I. 1996); Super. R. Civ. P. 56(c).

6. Because this matter is here on Hennessey's appeal from a summary judgment entered against her the facts are set forth in a light most favorable to Hennessey after all reasonable inferences have been drawn in her favor. *See, e.g., E.W. Audet & Sons, Inc. v. Fireman's Fund Insurance Co.,* 635 A.2d 1181, 1185 (R.I.1994).

7. The record is silent concerning certain distances and other facts that might be material to the ultimate resolution of this matter, including how many yards the golf hole was from the tee, how many strokes were par for the hole, the golf club used by Pyne on the tee, and the exact

After returning home from church one Sunday morning in mid-September, Hennessey paused to dally over some flowers in her front-yard garden. Her Sunday morning reverie amidst the summer flora, however, was rudely interrupted when Pyne's eleventh-hole-tee shot "veered slightly left" and without warning careened into the side of her head, thereby injuring her.

Pyne, the golf course's assistant pro, was well aware not only of the condominiums' presence but also of the propensity for the club's golfers to strafe them with misfired golf shots.[8] As for the extent and frequency of this enfilade, Hennessey testified at her deposition that for approximately five years, during the heaviest part of the playing season, her condominium was hit "about 10 times a day[; s]ometimes twice by the same person, especially if they were rounding 18 holes." She also answered interrogatories by noting that she had to install Plexiglas in various windows of her home because of the frequency with which golf balls had pelted the exterior and broken the glass. Moreover, Pyne was also aware of Hennessey's apparently vocal presence at or near the course, characterizing her as "a chronic nuisance to golfers here at Louisquisset." Although Hennessey testified at her deposition that she did not see Pyne's ball coming because trees hid the eleventh-hole tee from her front-yard vista, it is unclear from the record whether on this particular morning Pyne actually saw, or could have seen, Hennessey from where he addressed the ball on

the tee. Finally, there is nothing in the record to indicate whether Pyne shouted "fore" or attempted to give any warning either before or after he saw his tee shot heading off the course and toward Hennessey's condominium.

To obtain redress for her injuries, Hennessey filed a civil action in Superior Court against Pyne, the Louisquisset Country Club Condominium Association (association), and its executive board (board).[9] She alleged that Pyne was "guilty of nuisance and negligent and reckless misconduct" as well as "assault and battery." Pyne answered by admitting that although he struck the golf ball, he had no knowledge about whether it hit Hennessey. In his report to the association and its board, he states that "[i]t is apparent to me that the ball struck the side of the [condominium] unit" and that it was "questionable—if not impossible" that the ball hit anyone in the front yard. He also affirmatively alleged that Hennessey had assumed the risk of injury. After the parties engaged in some discovery, Pyne filed a motion for summary judgment on the grounds that "[t]here is no evidence establishing any negligence on [his] part." [10]

A Superior Court motion justice concluded that as a golfer engaging in a lawful and intended use of a golf course, Pyne owed no duty to Hennessey and that therefore summary judgment should enter against her on her negligence cause of action.[11] The motion

distance of Hennessey's front-yard garden and condominium from the tee.

8. In his report of the incident to the association and its board, Pyne noted that "[a]s happened so many times—to so many golfers—the ball hit a condominium."

9. Hennessey alleged that the association and its board were "guilty of nuisance and negligent and reckless misconduct." She also alleged that they constructed and maintained the golf course in a negligent manner, resulting in a nuisance. Hennessey's husband, William, joined in the suit, alleging a loss of consortium. These claims against the association and the board are still pending and are not before us in this appeal.

10. The association and its board joined Hennessey in filing an objection to Pyne's motion.

11. The motion justice noted that

"[i]n any event, it seems to me that looking at the question of duty and foreseeability in this matter, some of the undisputed facts are, that a plaintiff resides adjacent to the golf course and had prior to the incident giving rise to this litigation, become aware that golf balls were coming into her yard with, 'an unfortunate frequency,' I think she said, something like 10 a day. This has been going on for some time and she had, again, prior to this instance or incident, complained to the golf course to do something about this. However, on the day in question, at the time in question, she was obscured from the view of this golfer, perhaps, or the other golfers that passed by this place, by the vegetation, and the golfer couldn't see her. She couldn't see the golfer."

"I don't believe in this set of circumstances, that this golfer owed her a duty. He didn't know she was there, and she was—and voluntarily placed herself into a position that she

justice therefore granted Pyne summary judgment "relative to all counts that were brought" against him, and Hennessey appealed.[12] For the reasons set forth below, we affirm the judgment as it relates to the nuisance and assault and battery claims but reverse as it relates to the negligence claim.

## Analysis

### I

### Nuisance

■ Hennessey argues that a valid claim for nuisance exists against Pyne because he caused his golf ball to invade her protected-property interest in the private use and enjoyment of her land. However, "[u]nder Rhode Island law it is well settled that a cause of action for a private nuisance [that is, a conflict between neighboring contemporaneous land uses] 'arises from *the unreasonable use of one's property* that materially interferes with a *neighbor's* physical comfort or * * * use of * * * real estate.'" *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.*, 640 A.2d 950, 957 (R.I.1994) (quoting *Weida v. Ferry*, 493 A.2d 824, 826 (R.I.1985)). (First emphasis added.) Here, Pyne's use of the golf course was not unreasonable per se. Rather, while engaged in a lawful use of the golf course's property,[13] he hit a single golf ball toward Hennessey's condominium. Such an isolated incident is not the type of conduct that nuisance law is intended to remedy. *See Citizens for Preservation of Waterman Lake v. Davis*, 420 A.2d 53, 59 (R.I.1980) ("[t]he law does not attempt to impose liability in every case in which one person's conduct has some detrimental effect on another[; l]iability is imposed only in those cases in which the harm or risk to one is greater than * * * ought to be required * * * under the circumstances"). *Compare Nussbaum v. Lacopo*, 27 N.Y.2d 311, 317 N.Y.S.2d 347, 265 N.E.2d 762, 765 (1970) ("[n]uisance imports a continuous invasion of rights, and the occasional—'once or twice a week'—errant golf ball that was found on plaintiff's property does not constitute sufficient impairment of plaintiff's rights") *with Bechhold v. Mariner Properties, Inc.*, 576 So.2d 921, 922 (Fla.Dist.Ct. App.1991) (reversing summary judgment in favor of golf course owner in a private nuisance action where homeowners submitted affidavit to effect that approximately 1,000 balls per year enter their backyards). Moreover, he and Hennessey were not neighbors in the usual sense of the word. Thus whatever Hennessey's prospects may be in pursuing a nuisance claim against the golf course and the other defendants, she has no such claim against Pyne on these facts.

### II

### Assault and Battery

Hennessey also asserted a claim of assault and battery against Pyne. In her briefs submitted to this court, however, she claimed error only in regard to the battery count. We thus consider any claim of error about the entry of summary judgment on the assault claim as waived. Sup.Ct. R. 16(a). However, even were it not so, her assault appeal would have been unavailing.

■ As we recently confirmed, "Assault and battery are separate acts, usually arising from the same transaction, each having inde-

knew would be a receptacle from time to time for errant golf shots. So, while her claim against the club, meaning the golf club, may continue * * * there is no duty owed by [Pyne] to her in these circumstances, and there's nothing on the record to suggest otherwise. He wasn't being a wise guy, so to speak, aiming shots to see if he could hit someone's roof or anything of that nature. He had no reason to believe that his shot would go the way that it did, and that it would have an impact on this woman."

12. Hennessey argues on appeal that Pyne also committed a trespass by hitting his ball onto her property. Although her counsel mentioned at the hearing below that there was also a trespass count before the court, Hennessey's complaint does not contain a trespass claim. Perhaps because it was not included in her complaint, the motion justice did not address or dispose of the merits of this unstated claim, nor shall we.

13. Although "compliance with a zoning ordinance does not immunize a person from the consequences of * * * making an unreasonable use of * * * land * * * [t]he fact that the disputed activities are permitted by law may have some relevancy on the issue of whether * * * the use being made of the premises is reasonable." *De-Nucci v. Pezza*, 114 R.I. 123, 127–28, 329 A.2d 807, 809–10 (1974).

pendent significance." *Picard v. Barry Pontiac–Buick, Inc.*, 654 A.2d 690, 694 (R.I.1995) (citing *Proffitt v. Ricci*, 463 A.2d 514, 517 (R.I.1983)). " 'An assault is a physical act of a threatening nature or an offer of corporal injury which puts an individual in reasonable fear of imminent bodily harm.' " *Id.* "It is a plaintiff's apprehension of injury [which apprehension must be of the type normally aroused in the mind of a reasonable person] which renders a defendant's act compensable." *Id.* Here Hennessey was not even aware of Pyne's presence on the tee, much less did she apprehend any injury from the errant golf ball that struck her. Thus, a claim for assault will not lie in these circumstances.

■ Battery, on the other hand, is

"an act that was intended to cause, and in fact did cause, 'an offensive contact with or unconsented touching of or trauma upon the body of another, thereby generally resulting in the consummation of the assault. * * * An intent to injure plaintiff, however, is unnecessary in a situation in which a defendant willfully sets in motion a force that in its ordinary course causes the injury.' " *Id.*

Hennessey argues that "Pyne intentionally hit the golf ball. The ball in turn struck [Hennessey]. Thus, [Pyne's] actions constituted a battery." We disagree. First, the record does not suggest that Pyne intended to cause "an offensive contact with or unconsented touching of or trauma upon" Hennessey or any other person. There is simply no evidence to suggest that Pyne harbored any such intention. Second, although it is indisputable that Pyne's teeing off on the ball willfully set in motion a force, that force did not "in its ordinary course" cause Hennessey injury. Indeed, if the force (that is, the ball) had traveled "in its ordinary course"—at least after having been struck by the golf club's assistant pro—we can safely presume that it would have ordinarily headed for the fairway rather than for Hennessey's head.

Thus summary judgment was properly entered dismissing plaintiff's intentional tort and nuisance claims.

## III

### Loss of Consortium

As noted above, Hennessey's husband alleged in the complaint a claim for loss of consortium against Pyne. At the hearing on the summary-judgment motion, Pyne's counsel noted that "the basis for this motion was a complete summary judgment motion based on the facts of this case." Moreover, the motion justice granted summary judgment "relative to all counts that were brought against" Pyne. Thus summary judgment was granted against Hennessey's husband on his loss-of-consortium claim. *See, e.g., Bushman v. Halm*, 798 F.2d 651, 656 n. 8 (3d Cir.1986) (although "district court did not address the loss of consortium claim[s b]ecause it is wholly derivative from the underlying negligence cause of action, it was necessarily dismissed with the grant of summary judgment").

■ Because "a claim for loss of consortium is a separate and distinct cause of action," *Normandin v. Levine*, 621 A.2d 713, 716 (R.I.1993) ("[a]lthough the claim is derivative in nature and inextricably linked to the injured spouse's action * * * each spouse maintains an entirely unique cause of action under the law"), Hennessey's husband had a separately appealable issue, albeit one that could have been noticed jointly, *see* Sup.Ct. R. 3(b). However, the notice of appeal identifies the "Party Filing Appeal" merely as "Plaintiff," *see* Sup.Ct. R. 3(c) ("[t]he notice of appeal shall specify the party or parties taking the appeal"), and only one filing fee was paid. Thus Hennessey is the sole appellant, and her husband never appealed from the summary judgment dismissing his loss-of-consortium claim. *See* Sup.Ct. R. 5(a) ("[e]very person appealing from a judgment * * * shall pay a filing fee").

Notwithstanding the foregoing, Hennessey claims in her briefs, which refer variously to "plaintiff-appellant" and "plaintiffs/appellants," that "[s]ummary judgment was clearly inappropriate," not distinguishing amongst claims or parties and perhaps intending to include *sub silentio* her husband's loss-of-consortium claim against Pyne within the sweep of her broad attack on the motion justice's ruling. Apparently Hennessey re-

lies upon the inextricable link of her husband's loss-of-consortium claim to her own tort claims as support for her implicit request that summary judgment be reversed not just for her claims but also for that of her husband. *See Soares v. Ann & Hope of Rhode Island, Inc.,* 637 A.2d 339, 353 (R.I. 1994) ("a cause of action for loss of consortium 'arises from' the injured spouse's injury and depends on the success of the underlying tort claim"). But even if we could overlook the appeal-killing procedural deficiencies inherent in such a loose approach to the proper prosecution of a valid appeal [14] and conclude that Hennessey's husband was an intended if not an actual appellant, the Superior Court's dismissal of the loss-of-consortium claim has not been properly raised on Hennessey's appeal to us other than by the occasional references in her briefs to the existence of multiple appellants. But that is simply not enough for Hennessey's husband to have preserved his claim as part of the appeal. Thus any purported appeal of the motion justice's dismissal of the loss-of-consortium claims would have been waived by the failure properly to argue this issue to us, even if Hennessey's husband had paid a separate filing fee and been expressly named as an appellant in the notice of appeal. *See* Sup.Ct. R. 16(a).

## IV

### Negligence

Finally, Hennessey asserted that she was "injured as a result of the negligent, willful, wanton and reckless conduct of * * * Pyne." Such a claim could encompass three discrete theories: (1) that Pyne had hit his eleventh-hole tee shot in a negligent manner, (2) that he had failed to give an adequate warning before teeing off, and/or (3) that he had failed to give an adequate warning after having struck the ball and observed where it was going. *See Ludwikoski v. Kurotsu,* 875 F.Supp. 727, 730 (D.Kan.1995) (mem.). In addition to granting summary judgment on

each of the foregoing, the motion justice based his ruling on the alternative theory that even if Pyne had been negligent, Hennessey assumed the risk of injury by "voluntarily plac[ing] herself into a position that she knew would be a receptacle from time to time for errant golf shots."

The motion justice determined that "in this set of circumstances" Pyne owed no duty to Hennessey and thus granted his motion for summary judgment. However, we believe a golfer does owe a duty of care to persons living in residences immediately adjacent to the golf course who are known by the golfer to be within the normal range of striking distance for the golf shot he or she is playing. Moreover, our review of the record reveals questions of material fact concerning whether that duty was breached and, if so, whether Pyne's breach was the proximate cause of Hennessey's injuries. Thus, we reverse the grant of summary judgment in regard to the negligence claim and remand for trial on this cause of action.

"[T]he determination of whether a duty exists is a legal issue for the court to decide." *Kenney Manufacturing Co. v. Starkweather & Shepley, Inc.,* 643 A.2d 203, 207 (R.I.1994). In the making of this determination, "no clear-cut formula * * * exists." *Id.* at 206. Rather, "[u]nder our ad hoc approach we consider all relevant factors, including the relationship of the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations, and notions of fairness." *Id.* Finally, as this court has frequently noted, "[t]he 'risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others *within the range* of apprehension * * *.'" *Builders Specialty Co. v. Goulet,* 639 A.2d 59, 60 (R.I.1994) (quoting *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99, 100 (1928) (Cardozo, C.J.)); *see also Splendo-*

---

**14.** *See* Sup.Ct. R. 3(a) ("[f]ailure of an appellant to take any step *other than the * * * payment of a filing fee * * ** does not affect the validity of the appeal") (emphasis added); *see also Kirby v. Planning Board of Review of Middletown,* 634 A.2d 285, 288 (R.I.1993) ("notwithstanding the [notice of appeal's] reference to * * * [another purported appellant,] the appeal clearly was filed by" the named appellant alone because there was only one filing fee paid); *Martin v. Lilly,* 505 A.2d 1156, 1160 (R.I.1986) ("payment of the proper fee is a * * * prerequisite to a valid appeal").

*rio v. Bilray Demolition Co.*, 682 A.2d 461, 466 (R.I.1996) ("[t]he linchpin in determining the existence of any duty owed * * * was the foreseeability of the risk of injury").

■ The general rule in this type of case is that "the mere fact that a person is struck by a golf ball driven by a person playing the game of golf does not constitute proof of negligence on the part of the golfer who hit the ball, and that a golfer is only required to exercise reasonable care for the safety of persons reasonably within the range of danger of being struck by the ball." *Ludwikoski*, 875 F.Supp. at 731. Nonetheless, when as here a golfer knows that residences are located within striking distance of the spot where the golfer stands to play the ball, the risk reasonably to be perceived is such that the golfer has a duty to exercise reasonable care for the safety of those people who may be located within that range. *See Nussbaum*, 317 N.Y.S.2d at 356–57, 265 N.E.2d at 769 (Bergan, J., dissenting) ("[i]f in sight of a residence a player makes such a poor shot * * * and injury results to someone having no connection with the game, a cause of action seems established against such a player"). Even though it is true that "even * * * the utmost concentration and * * * 'tedious preparation' that often accompanies a golfer's shot [does] * * * no[t] guarantee that the ball will be lofted onto the correct path," *Rinaldo*, 579 N.Y.S.2d at 629, 587 N.E.2d at 267, here material questions of fact exist regarding whether Pyne breached his duty of reasonable care. Although Hennessey did not see Pyne's tee shot and Pyne offered no explanation of his conduct in relation to how and where he hit the ball, the following circumstances raise material questions of fact concerning whether he breached his duty of reasonable care to Hennessey in the way he played this golf shot: Pyne's awareness of the existence and the proximity of Hennessey's condominium as being within striking distance of his tee shot (midway down the fairway in the crook of a slight dogleg left); his knowledge that the condominiums where Hennessey lived were regularly hit by golf balls; his consciousness of Hennessey's apparently ubiquitous and complaining presence on or near the course (referring to her as "a chronic nuisance to golfers here at Louisquisset"); and his appreciation of the golfing advantage to be gained on this dogleg hole if he drove the ball off the tee as closely as possible past Hennessey's condominium (without striking it), thereby maximizing the distance of his shot and the lie of his ball down the fairway.

■ Next, we consider Hennessey's negligence claim as it relates to Pyne's alleged failure to warn adequately. "The general rule is that although a golfer about to hit a shot must, in the exercise of ordinary care, give an adequate and timely warning to those who are unaware of his or her intention to play and who may be endangered by the play, this duty does not extend to those persons who are not in the line of play if danger to them is not to be anticipated." *Ludwikoski*, 875 F.Supp. at 731. Here, Hennessey's yard was a mere fourteen feet off the course on a dogleg left, and Pyne knew that golfers on the course regularly hit these condominiums with their shots. *But see Nussbaum*, 317 N.Y.S.2d at 353–55, 265 N.E.2d at 767 (no duty to warn because "only an extraordinarily misdirected shot attaining great height could possibly drop on plaintiff's property" that was not located on a "dog-leg" and was protected by a natural barrier of twenty to thirty feet of rough with forty-five to sixty-five-foot-high trees). Although not technically within the line of play, the propinquity of plaintiff's property to the course—coupled with the proclivity of a driven golf ball to go astray—virtually ensured that plaintiff's condominium would receive its share of mishit balls unless preventative measures were taken. *See Rinaldo*, 579 N.Y.S.2d at 629, 587 N.E.2d at 267 ("the possibility that the ball will fly off in [an unintended] direction is a risk inherent in the game" and " 'even the best professional golfers cannot avoid an occasional "hook" or "slice" ' "). Moreover, Pyne generally knew of Hennessey's presence in that he characterized her as a "chronic nuisance." Thus we believe it is a jury question whether Pyne knew or should have known that Hennessey was potentially in the foreseeable zone of danger and whether Pyne should have anticipated the danger to Hennessey and taken

reasonable steps to avoid or lessen that danger.[15]

We also believe that after seeing his ball "veer slightly left" toward the looming and known-to-be-occupied condominiums, Pyne may have had a duty to shout a warning. Whether that duty was breached here is a question to be resolved at trial. The possibility that such warning would have been unheard or ineffective or otherwise unavailing is not so clear on this record to warrant an award of summary judgment dismissing such a claim. *Compare Ludwikoski*, 875 F.Supp. at 729, 732 (plaintiff was held to be outside the foreseeable ambit of danger and not entitled to a forewarning of defendant's teeing off because to strike plaintiff, "[t]he ball [had to] travel[ ] over the perimeter fence, through a group of trees planted by the golf course to prevent errant shots from leaving the course, over Belinder Road, through another group of trees and into plaintiff's open car window"; it was sufficient as a matter of law that a warning was given after the golfer's tee shot began to hook (the foursome all yelled "FORE" as loudly as possible)) *with Rinaldo*, 579 N.Y.S.2d at 629, 587 N.E.2d at 266 (possibility that a warning would have been effective to prevent an accident was simply too "remote" in circumstances in which the ball traveled through or over a screen of trees and hit the plaintiff who was driving on a nearby roadway) *and Nussbaum*, 317 N.Y.S.2d at 352–53, 265 N.E.2d at 766 (duty to warn did not extend to adjacent-resident-owner plaintiff because "[l]iving so close to a golf course, [the] plaintiff would necessarily hear numerous warning shouts each day" and could be expected to ignore them *because his house had never been struck* ).

## V

### Assumption of the Risk

Finally, we believe summary judgment should not have been entered in Pyne's favor on the basis that Hennessey assumed the risk of injury. The doctrine of assumption of the risk is an affirmative defense that "may be invoked * * * by a tortfeasor to escape or to diminish liability" for having created "an unreasonable risk of injury." *Labrie v. Pace Membership Warehouse, Inc.*, 678 A.2d 867, 872 (R.I.1996). In the absence of an express agreement, "a defendant must prove that a plaintiff 'knew of the existence of a danger, appreciated its unreasonable character, and then voluntarily exposed himself [or herself] to it.'" *Id.*; *see also Loffredo v. Merrimack Mutual Fire Insurance Co.*, 669 A.2d 1162, 1164 (R.I.1996). "In determining whether an individual was aware of a particular risk and understood its character, we shall look to the record to ascertain 'what the particular individual in fact saw, knew, understood, and appreciated'" at the time of injury. *Loffredo*, 669 A.2d at 1164. "Generally, whether a plaintiff assumed a risk of harm and thereby absolved a defendant from creating an unreasonable risk of injury is an issue for a trier of fact to resolve." *Labrie*, 678 A.2d at 872. "Only if the record suggests but one inference * * * is this issue one to be decided by the trial justice on a summary-judgment motion." *Id.* Finally,

"the doctrine of assumption of risk should not be applied with liberality, if it be applicable at all, where the injury takes place on plaintiff's own property, which in itself is safe and which is rendered dangerous only by invasion of missiles from adjacent land. Otherwise, the owner of the neighboring property could force the homeowner to remain out of his [or her] yard and his [or her] swimming pool [or garden] during hours when it was possible that golfers might hit their shots on to his [or her] property. To a limited extent he [or she] would be a prisoner within his [or her] home." *Curran v. Green Hills Country Club*, 24 Cal.App.3d 501, 101 Cal.Rptr. 158, 160–61 (1972).

In examining the record in the light most favorable to Hennessey, we cannot say that as a matter of law Hennessey voluntari-

---

**15.** We leave it to the factfinder to determine what those reasonable steps might be. However, they might well include one or more of the following: adjusting the force of his swing, using a different club to strike the ball, and attempting to play the ball to the right of the fairway (and thus away from the condominiums).

ly assumed the risk of being struck by Pyne's golf ball. Initially, Hennessey testified that she did not even see Pyne on the tee before or after he hit the ball. Therefore, although she was doubtless aware of the general risk she faced of getting hit by stray golf balls whenever she ventured outside in any playable weather, the record does not permit us to conclude that she was aware of this particular risk at the time when she was struck. *See Curran,* 101 Cal.Rptr. at 160 ("[t]here is no evidence that plaintiff had knowledge and appreciation * * * that there were golfers in the vicinity of his home at the time of the accident").

Moreover, even if Hennessey at the time of the accident had been aware of Pyne's presence on the tee, it is entirely possible that her "acceptance of [the] risk is not voluntary [because Pyne's] tortious conduct * * * left [her] no reasonable alternative course of conduct in order to * * * exercise * * * a right or privilege of which [he] * * * has no right to deprive [her]." Restatement (Second) *Torts* § 496E(2)(b) (1965); *see also* William L. Prosser, *Handbook of the Law of Torts* § 68 at 451 (4th ed.1971) ("[i]n general, the plaintiff is not required to surrender a valuable legal right, such as the use of his [or her] own property as he [or she] sees fit, merely because the defendant's conduct has threatened him [or her] with harm if the right is exercised"). In other words, by pleading assumption of the risk as a defense, Pyne should not have been allowed via summary judgment to condemn Hennessey, whenever the golf course was playable, to the Hobson's choice of home confinement in her Plexiglas bunker or of venturing outside subject to being suddenly stoned by a mishit golf ball. To dispose of such an argument on summary judgment would be to "deprive[ ] [Hennessey of her] freedom of choice, and so [Pyne] cannot be heard [t]o say that [s]he has voluntarily assumed the risk" as a matter of law. Prosser, *Handbook of the Law of Torts* § 68 at 451.

Furthermore, Hennessey was neither a participant nor a fellow spectator in the game being played; rather, she merely resided adjacent to the course upon which Pyne's golf game was in progress. *Compare Kennedy v. Providence Hockey Club, Inc.,* 119 R.I. 70, 77, 376 A.2d 329, 333 (1977) (the plaintiff's "familiar[ity]" with the flying-puck syndrome" supports inference that she "voluntarily and knowingly encountered the risk" of being hit by a hockey puck while a spectator at a hockey game and thus that she assumed that risk) *with James v. R.I. Auditorium,* 60 R.I. 405, 413, 199 A. 293, 297 (1938) (although "a spectator at th[e] nationally known game [of baseball] may ordinarily be held to have assumed such a risk [of being hit, i]t is going quite far to assume, however, that the average person has the same knowledge respecting the risk of being hit by a flying puck in a hockey game"); *see also Baker v. Thibodaux,* 470 So.2d 245, 247 (La.Ct.App.1985) (danger of a player's being hit by a shot gone astray is "a risk all golfers accept"). And, as previously mentioned, she apparently lived there *before* "they started golfing the first time." *Cf. Nussbaum,* 317 N.Y.S.2d at 350–52, 265 N.E.2d at 765 ("one who deliberately decides to reside in the suburbs on very desirable lots adjoining golf clubs and thus receive the social benefits and other not inconsiderable advantages of country club surroundings must accept the occasional, concomitant annoyances"). Thus any risks to Hennessey arising from errant golf balls may have been imposed *ex post facto* rather than assumed as part of the *status quo ante* when she took up her residence.

The "alternatives" open to Hennessey—moving away, avoiding all going out of doors during daylight hours when golfers are on the course,[16] or the wearing of some type of protective armor when she ventures forth during playing hours—do not strike us as options that are so reasonable on their face as to convert Hennessey's alleged assumption of the risk into a summary judgment question. *See* Restatement (Second) *Torts* § 496E at cmt. c ("[t]he existence of an alternative course of conduct which would avert the harm * * * does not make the plaintiff's choice voluntary, if the alternative

---

**16.** Unfortunately after the incident Hennessey felt compelled to do just that. When questioned at her deposition about what she would do "in regard to [her] fear about going outside with the golf balls," she replied, "I'll stay inside."

is one which he [or she] cannot reasonably be required to accept"); *cf. Marshall v. Ranne*, 511 S.W.2d 255, 260 (Tex.1974) (plaintiff's choice of remaining inside his home, thereby surrendering right to proceed over his own property, or risk reaching his pickup before the defendant's vicious boar hog could attack him was not voluntary as a matter of law).

In sum, we believe that the question of whether Hennessey voluntarily assumed the risk of injury when she tarried to flower gaze in her own garden upon returning from church on a summer Sunday morning is a factual question to be resolved by the jury, and thus summary judgment should not have been entered against her negligence claim upon this basis. *See Pereira v. Tellier*, 583 A.2d 523, 524 (R.I.1990) (because plaintiff was not "subjectively aware of the danger [he] had not voluntarily exposed himself to that danger, having appreciated its unreasonable character"); *Rickey v. Boden*, 421 A.2d 539, 545 (R.I.1980) (Kelleher & Murray, JJ., dissenting) (evidence was sufficient to allow jury to determine that options of plaintiff were so limited that assumption-of-the-risk defense would be rendered inapplicable).

### Conclusion

For the foregoing reasons Hennessey's appeal is denied and dismissed in part and sustained in part. The summary judgment appealed from is affirmed to the extent it dismissed Hennessey's nuisance, assault, and battery claims and her husband's loss-of-consortium claim, but it is reversed in regard to her negligence claim. The papers of this case shall be remanded to the Superior Court for further proceedings consistent with this opinion.